15323

CROUCH v. BENET *ET AL.*

(17 S. E. (2d), 320)

*Mr. R. E. Carwile* and *Mr. F. Ehrlich Thomson,* both of Columbia, for petitioner,

*Mr. John M. Daniel,* Attorney General, *Messrs. M. J. Hough* and *T. C. Callison,* Assistant Attorneys General, for respondents,

November 6, 1941.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE A. L. GASTON.

This proceeding in the original jurisdiction of the Supreme Court of South Carolina is for the purpose of testing the constitutionality of Section 102 of Act No. 260 of Acts of 1941, 42 St. at Large, p. 421. The petition asks that respondents be enjoined and restrained perpetually from issuing certificates of indebtedness, as provided in Section 102 of said Act. The rule and temporary restraining order were heretofore, on August 28, 1941, issued by Mr. Chief Justice Bonham, requiring respondents to show cause why said petition should not be granted and respondents permanently enjoined.

Section 102 of Act No. 260 provides for issuance of certificates of indebtedness not exceeding five hundred and fifty thousand ($550,000.00) dollars at interest rate not to exceed four (4%) per cent per annum and to mature over a period of twenty (20) years. The proceeds derived from the sale of said certificates of indebtedness are to be used by the regents of the South Carolina State Hospital in pro-

viding additional buildings and facilities at said hospital and the State Training School. Both of these institutions are owned and operated by the State of South Carolina.

The petitioner appears in his own right and as a citizen and taxpayer of the State of South Carolina and in behalf of all other persons similarly situated who may come in and contribute to the costs of and expenses of this proceeding.

The sole contention of the petitioner is that the Act in question is unconstitutional, and should be declared null and void for the reason that it violates the provisions of Section 17 of Article 3 of our State Constitution which provides that: "Every Act or resolution having the force of law shall relate to but one subject, and that shall be expressed in the title."

The title of Act No. 260, which is generally referred to as the "General Appropriation Act," is "An Act to Make Appropriations to Meet the Ordinary Expenses of the State Government for the Fiscal Year Beginning July 1, 1941; to Provide Revenue to Defray the Same; for Borrowing Money; to Authorize the Issuance of Certificates of Indebtedness for Constructing Additional Buildings at the South Carolina State Hospital and at the State Training School and to Provide for the Payment Thereof; to Provide for Additional Revenue from the Tax on Alcoholic Beverages; to Limit the Sale of Certain Wines to Licensed Liquor Stores; and to *Further Regulate the Fiscal Affairs of South Carolina.*" (Italics added.)

The petitioner contends that there are three subjects expressed in the title and embraced in the body of the Act, which are diverse in their nature, have no necessary connection and are wholly unrelated, one of them being temporary in nature and two being permanent in nature as shown by Section 107 of the Act. The petition alleges that the Act relates to the immediate fiscal affairs of the State for the fiscal year 1941-1942, and that the issuance of bonds as provided for in said Act does not relate to the immediate fiscal affairs of the State, but provides funds for the construction

of buildings for the institution in question (the bonds being payable over a period of twenty years) and "that it therefore violates the provisions of the above quoted section of the Constitution in that the title to and the body of the Act relates to more than one subject."

The law on this subject has been fully declared by this Court. This Court has consistently held that:

"When general subject of act is expressed in title, any details of legislation which provide means, methods, or instrumentalities intended to facilitate accomplishment of general purpose and are germane to act may be embraced in body thereof without violating constitutional provision requiring that every act should relate to but one subject which should be expressed in title." *Crawford v. Johnston, Governor, et al.,* 177 S. C., 399; 181 S. E., 476, and cases cited; *Witt v. People's State Bank,* 166 S. C., 1; 164 S. E., 306; 83 A. L. R., 1068; *State ex rel. Richards v. Moorer,* 152 S. C., 455; 150 S. E., 269; *Freeman v. Holiday,* 165 S. C., 408; 164 S. E., 20; *Arthur v. Johnston,* 185 S. C., 324; 194 S. E., 151.

Counsel for both parties have ably argued their positions in this case and have cited other authorities, but we think the recent decision of this Court amply sustains and settles the views herein expressed. In the decision in the case of *Arthur v. Johnston, Governor,* 185 S. C., 324; 194 S. E., 151, the opinion of the Court by Mr. Justice Baker most clearly, convincingly and conclusively expounds the meaning, purpose and intent of this constitutional provision. We quote as follows (from page 332 of 185 S. C., page 155 of 194 S. E.):

"The title of the act indicates that its real purpose is to provide for the construction of buildings for certain state educational institutions. That is the subject of the act and the one subject thereof. To accomplish this purpose the act allocates a certain portion of the income tax, and since such allocation would reduce the revenues of the state now being used for school purposes, the liquor tax was increased. It

is no doubt true that in the body of the act the connection between the various articles thereof might have been stated more explicitly.

"But it is no novel principle to construe an act with reference to its title, and the body of the act taken in connection with the title manifests the legislative purpose, to wit, to construct the much needed buildings, using the income tax for that purpose, and increasing the liquor tax to replace revenue available for school purposes depleted by such use of the income tax. *Robson v. Cantwell, Supervisor,* 143 S. C., 104-116, 141 S. E., 180, 181. Section 17 of Article 3 of the Constitution must, of course, be liberally construed in the light of its purpose, which is really to prevent fraud on the legislature by hodgepodge or log-rolling methods. It certainly should not be so construed as to defeat the legislative will merely because the language of the act might have more clearly shown the connection between its various articles and sections. In the case of *Poulnot v. Cantwell,* 129 S. C., 171; 123 S. E., 651, 653, the Court held that as used in this section of the Constitution 'subject' 'is the thing legislated about, or the matter or matters upon which the legislation operates, to accomplish a definite object, or objects reasonably related one to the other.' "

In the light of these decisions an examination of the Act under consideration will disclose that it is not repugnant to Section 17, Article III, of our State Constitution. This Act provides for the fiscal affairs of the State Government for the year beginning July 1, 1941, this being the primary object. To consummate this primary object certain certificates of indebtedness are authorized to be issued and sold, the proceeds derived therefrom to be used only in payment of the expenditures incurred in providing additional buildings and facilities at the South Carolina State Hospital and the State Training School. The legislature is duty bound to make provisions for these State institutions which care for those persons who are suffering from mental disease and who are incapacitated by reason of mental de-

fects, this being the solemn duty of the State. The verified return herein shows that the prevailing greatly overcrowded conditions at these institutions has forced those in charge of the said institutions to deny requests for treatment and admission thereto to numerous persons suffering from mental diseases. Due to the financial condition of the State it is necessary to issue these certificates, so as to provide additional facilities at these institutions and this is properly incorporated in Act No. 260, known as the "General Appropriation Act." The additional tax on alcoholic beverages and limitation placed on the sale of same, as provided in this Act, is merely a means to effectuate the object of said Act and is not foreign to the subject of the same as expressed in the title. The objection that the Act has three subjects expressed in the title cannot be sustained for the reason that the matters expressed are closely allied and related, having one subject, the fiscal affairs of the State, thus satisfying the constitutional requirements as construed by this Court.

We may digress here to say that in no sense of the word is legislation in behalf of the State Hospital for the Insane log-rolling in its nature, for the purpose of securing the passage of measures in its favor which could not succeed otherwise upon its own merits.

Historically, we are told by Judge John Belton O'Neal, the State Hospital for the Insane originated with Captain Samuel Farrow, of Spartanburg District, upon seeing by the roadside ofttimes on his way to Columbia, a poor woman from Greenville, who at the sessions of the legislature, visited Columbia for many years. With the cooperation of the cultured lawyer, William Craft, Esq., of Charleston, the legislature was prevailed upon by these gentlemen to pass a creative act in December, 1821, authorizing the erection of a suitable building for an asylum for the unfortunate mental patients and sufferers in the State and a school for the deaf and dumb. The first building which was designed by the State Architect and Engineer, the renowned Robert Mills, was erected in 1822, and is still in use in the City of Colum-

bia as probably the oldest building now standing in the United States built by a State for the insane.

On December 12, 1828, while the legislature was then in session, a young white woman was received as the first patient of the State Hospital for the Insane (then known as the State Lunatic Asylum), and her mother was appointed matron to care for her. South Carolina was, therefore, the pioneer of the southern states in the care of the insane. This State Hospital for the Insane has been supported, maintained, and at times greatly improved by the addition of other modern buildings pursuant to Acts of the Legislature and by means of appropriations for this most worthy, humane and beneficient purpose as a State Institution. It is the long established and settled policy of the State to adequately provide funds each year to carry on this benevolent public charity.

The enforcement of this public policy of the State is also perpetually enjoined by the provisions of the Constitution in these words, to-wit: "Institutions for the care of the insane * * * and the poor shall always be fostered and supported by this State, and shall be subject to such regulations as the General Assembly may enact." Article 12, Section 1, Constitution 1895.

It is not only a wise provision of law, but it is the long established public policy of the State to own, operate, foster and support the State Hospital for the Insane by legislative enactment from time to time and from year to year. All of the demands of society and a humane regard for the welfare of the helpless members of society who because of mental infirmities cannot care for themselves, as well as the mandate of the Constitution of the State, require that legislative appropriation shall be made as often as may be necessary to carry out this purpose.

A consideration seriatim of the objections urged by the able argument of counsel for the petitioners to the validity of the Act before the Court leads unhesitatingly to the conclusion that the Act should and must

be sustained and upheld. The only ground of the objections is based upon the claim that the Act is invalid on the theory that it relates to more than one subject. There is no doubt about the title expressing fully the subject of the Act, and of course it is unnecessary for the title to be a full and complete index of the contents of the law. The general purpose of the Act is undoubtedly fiscal in its import, that is pertaining to the public treasury and revenues of the State; it is a financial measure dealing with the money affairs of the State. The expenditures and appropriations necessarily depend upon taxation and revenues, and at times upon borrowing money. Although some of these items may be temporary and others permanent, the subject-matter is identically the same, and only a legislative problem arises in regard to the duration of parts of the Act, as the constitutional limitation in no way impinges upon the permanency of the laws of the State.

It is not disputed that the proposed loan can be procured and the proceeds expended within the fiscal year, while of course the repayment and necessary revenues therefor extend over a period of twenty years. If this law was enacted in a separate Act, it would still embrace matters of a temporary nature and others of a longer duration, without impairing the validity of the law. Nor do we regard the suggestion that the matters relating to the finances of the State Hospital came into the Act as amendments, or by way of "riders," as having any bearing upon the constitutional limitations. This Court has often held that an Act of the General Assembly cannot be impeached in this way. *Wingfield v. South Carolina Tax Commission,* 147 S. C., 116; 144 S. E., 846. Furthermore the Constitution itself expressly permits such a procedure as follows, to-wit: "Bills for raising revenue shall originate in the House of Representatives, but may be altered, amended or rejected by the Senate; all other bills may originate in either house, and may be amended, altered or rejected by the other." Article 3, Section 15, Constitution 1895.

It is not essential to cite further the decisions of this Court in regard to the present issues. However, the most excellent annotations to the Code of 1932 contain a complete list of cases in point all of which sustain the conclusions herein set forth. See Volume 1, Code 1932, State Constitution 1895, Article III, Section 15 and Section 17, pages 1038 and 1039 to 1042.

A preliminary question is also raised by the respondents to the effect that the petitioner cannot maintain this suit because the taxes levied by the Act for the State Hospital are indirect and not *ad valorem* in their nature and will not be paid by the petitioner as a taxpayer. Perhaps this ground would be well taken in some other case under different circumstances, but it is the duty of every good citizen to protect the public interest, and especially to scrutinize the spending of money by the State in behalf of all of the people of the State and not only that of the actual taxpayers on an ad valorem basis. We think that the petitioner is to be commended for his diligence and public spirited interest in the welfare of the State under the facts of this case. The beneficial interest in the results of a suit of this nature is undoubtedly in the public, and may be maintained by a taxpayer generally under all of the pertinent decisions of this Court. *Mason v. Williams,* 194 S. C., 290, at page 316; 9 S. E. (2d), 537.

In conclusion we may well adopt and repeat the language of this Court in a recent case as fully applicable now, as follows, to-wit: "A careful consideration of all the questions raised by the petitioner discloses no substantial merit in his several contentions. In other words, he has failed to sustain the burden cast upon him of showing the unconstitutionality of the statute beyond a reasonable doubt." *Crawford v. Johnston, Governor, et al.,* 177 S. C., 399; 181 S. E., 476, 481.

The judgment, therefore, of the Court is that the Act in question be, and hereby is, declared constitutional and

valid, and that the injunction prayed for be denied and the petition dismissed. And it is so ordered.

MESSRS. ASSOCIATE JUSTICES BAKER, FISHBURNE and and MR. ACTING ASSOCIATE JUSTICE L. D. LIDE concur.