16521

STATE *EX REL.* RODDEY v. BYRNES, GOVERNOR, *ET AL.*

(66 S. E. (2d) 83)

488

*Messrs. C. T. Graydon, Augustus T. Graydon, John Grimball* and *J. Bratton Davis,* all of Columbia, *for Petitioner-Relator,*

*Messrs. C. T. Callison, Attorney General,* of Columbia, *James S. Verner, Assistant Attorney General,* of Columbia, *Edgar A. Brown,* of Barnwell, and *Sinkler, Gibbs & Simons,* of Charleston, *for Respondents,*

July 9, 1951.

STUKES, Justice.

Introductory

This action in the original jurisdiction of the Court is an attack upon the constitutionality of the General Appropriation Act which was adopted at the recently adjourned session of the Legislature and approved by the Governor April 19, 1951. The title is in first part as follows: "An

Act to make appropriations to meet the ordinary operating expenses of the state government for the fiscal year 1951-52; to provide a more efficient public school system by increasing teachers' salaries, by providing additional funds for supervision and overhead expenses, and by inaugurating a state-operated school transportation system; to create a State Educational Finance Commission and to prescribe its duties and powers; to abolish certain county boards of education and to create new boards in their stead, and to devolve new powers and duties on county boards of education; to provide for a program of construction of school building and other school facilities in the state, and to provide for financing this program by authorizing the issuance of general obligation bonds of the state not to exceed, at any one time, the sum of $75,000,000.00, and the further sum of not exceeding $7,-500,000.00 for the acquisition of school busses; to enact a general retail. sales tax, and to pledge sufficient revenue therefrom to retire the bonds authorized in this Act;" etc.

The remainder of the title, which need not be reproduced, lists other features which relate to various taxes, salaries of state employees and officials, etc., and concludes with the following clause: "and further relating to the fiscal affairs of the State of South Carolina.'"

There are many allegations of alleged unconstitutionality, all of which have been carefully considered in the light of the briefs and oral arguments and are found to be without merit. In the interest of economy of time and space they will not be separately stated but all will be at least briefly discussed and disposed of in what will be said, and the order in which they were presented in relator's brief will be followed. Some are trivial and those of any importance have been settled adversely to relator's contentions by prior decisions of this court, not all of which need be cited. It must be remembered that the General Assembly possesses plenary legislative power and, representing the people who are the source of all governmental power, its acts carry a strong presumption

of validity and will not be judicially declared to be invalid unless, beyond reasonable doubt, in contravention of some constitutional inhibition. *Gaud v. Walker,* 214 S. C. 451, 53 S. E. (2d) 316.

### The Act Generally

It is asserted that the Act violates section 17 of Article III of the constitution of 1895 which requires that such relate to but one subject and that be expressed in the title. It is urged particularly that the issuance of State bonds is irrelevant to the subject, which however is *State finances.* The following decisions are conclusive against the contentions with respect to the title of the Act: *State ex rel. Coleman v. Lewis,* 181 S. C. 10, 186 S. E. 625; *DeLoach v. Scheper,* 188 S. C. 21, 198 S. E. 409; *Crouch v. Benet,* 198 S. C. 185, 17 S. E. (2d) 320; and *Doran v. Robertson,* 203 S. C. 434, 27 S. E. (2d) 714.

It is next undertaken to show that in the passage of the Act section 18 of the same Article was violated.

It requires, *inter alia,* the reading of a bill on three several days in each House of the Assembly. This Court, along with the United States Supreme Court and the courts of last resort of the most, at the least, of the states, adheres to the "enrolled bill rule" which does not permit inquiry such as relator would make. *State ex rel. Hoover v. Town Council of Chester,* 39 S. C. 307, 17 S. E. 752, 755. *Wingfield v. Tax Comm.,* 147 S. C. 116, 144 S. E. 846. *Parrott v. Gourdin,* 205 S. C. 364, 32 S. E. (2d) 14. Moreover, relator has failed to point out any violation, even if it were proper to resort to the legislative journals which he mistakenly produced at the hearing.

Next invoked is section 14 of Article I of the constitution which specifies separation of the legislative, executive and judicial branches of the government and it is claimed that it is violated by the provisions of the Act whereby the State Educational Finance Commission

is given power to promulgate reasonable rules and regulations which shall have the force and effect of law, and the Governor and State Treasurer are authorized to issue State School Bonds for the construction and improvement of public school facilities on the basis of Commission estimates of the proceeds of the retail sales tax. There is no violation. The law on the delegation by the general assembly of rule-making power to administrative agencies was fully reviewed in *Davis v. Query,* 209 S. C. 41, 39 S. E. (2d) 117. Such delegation as we find in the Act before us is well within the law as there laid down. The State Highway Bond Act was the apparent model for the machinery for issuance of the presently authorized State School bonds. Secs. 5947, *et seq.,* Code of 1942. Its validity was determined by an *en banc* Supreme Court in State *ex rel. Richards v. Moorer, infra,* 152 S. C. 455, 150 S. E. 269, certiorari denied 281 U. S. 691, 50 S. Ct. 238, 74 L. Ed. 1120. It is so similar in this respect as to constitute an exact precedent for the decision of the case at bar. There was no unconstitutional delegation of legislative or judicial power to executive and administrative offers there, and none here.

The determination of the sufficiency of the special fund to meet interest and principal maturities of such school bonds as shall be issued is in the nature of a judicial function, it may be conceded, but is not such as may not be delegated to executive and administrative officers under the constitution. "The exercise of judicial functions, or *quasi* judicial functions, is often necessary as an incident to the exercise of the powers conferred by the Constitution upon the other coordinate branches of the government * * * in all cases where the exercise of judgment and discretion are required. But this is not judicial power vested in the courts. It would be difficult to give an exact definition of the words 'judicial power' as used in the Constitution, which would be appliable to all cases which might arise * * *. The Constitution assumed the existence of an organized society. when it vested the judicial power in the courts, it

had reference to the judicial power then existing, and such as the people then understood to be vested in and exercised by the courts." *Carolina Glass Company v. State,* 87 S. C. 270, 69 S. E. 391, 399. The result of the exercise of the power is, of course, subject to court review and reversal in proper cases and on requisite facts which natually cannot at this stage be shown by relator.

The Act contains provision for the appointment of County Boards of Education by the Governor upon the recommendations of the Senator and at least one-half of the members of the House of Representatives from the respective counties. This method of appointment of public officers is a common one and does not constitute an illegal delegation of legislative power. The subject is encompassed within the following decisions: *State v. Bowden,* 92 S. C. 393, 75 S. E. 866; *State ex rel. Coleman v. Lewis, supra,* 181 S. C. 10, 186 S. E. 625; *Elledge v. Wharton,* 89 S. C. 113, 71 S. E. 657; *Russell v. Lyon,* 90 S. C. 5, 72 S. E. 496; *Ruff v. Boulware,* 133 S. C. 420, 131 S. E. 29; and *Blalock v. Johnston,* 180 S. C. 40, 185 S. E. 51.

The relevancy of relator's citation of section 3 of Article X is not seen. It requires a tax statute to state its object, to which the proceeds shall be applied. The contention, without citation of supporting authority, is that surplus from the revenue provided by the Act, after payment of the principal and interest of the School Bonds and payments of overplus into the school fund, is unallocated. There is no suggestion that the State treasury cannot contain any surplus and the making of the point would seem to betray relator's confidence that the special fund will be more than ample to meet the principal and interest of the obligations which will be issued pursuant to the term of the Act, which is inconsistent with other prongs of his attack.

Also entirely unsubstantiated is relator's complaint of violation of sec. 6 of Article X which enjoins the loan or pledge of the credit of the State, quoting from the Constitution, "for the benefit of any individual,

company, association or corporation". The Act does not contemplate or authorize any such.: On the other hand, it manifests the legislative intent to fully meet the injunction of the opening sentence of sec. 5 of Art. XI, which is: "The General Assembly shall provide for a liberal system of free public schools for all children * * *." And that is a primary public purpose.

Next cited are the provisions of sections 1 and 3 of Article I which are as follows:

"Section 1. All political power is vested in and derived from the people only, therefore they have the right at all times to modify their form of government."

"Section 3. The General Assembly ought frequently to assemble for the redress of grievances and for making new laws, as the common good may require."

It is a universally accepted tenet of constitutional law that a legislature may enact statutes which result in contracts which may be of effect beyond the life of the enacting legislature. The bonds here contemplated and the pledge of revenue for the payment of them will constitute such contracts and are therefore within the legislative power. The obligations of them will be protected from impairment by the federal and state constitutions. U. S. Const., Art. 1, sec. 10. S. C. Const. of 1895, R. I., sec. 8. To give force to relator's contention hereabout would render impracticable, if not impossible, the issuance of bonds at all. *Wolff v. New Orleans,* 103 U. S. 358, 26 L. Ed. 395. *State of Indiana ex rel. Anderson v. Brand,* 303 U. S. 95, 58 S. Ct. 443, 82 L. Ed. 685. Our gasoline tax "diversion cases" demonstrate this court's fidelity to the principle. *State ex rel. Edwards v. Osborne,* 193 S. C. 158, 7 S. E. (2d) 526. *State ex rel. Edwards v. Osborne,* 195 S. C. 295, 11 S. E. (2d) 260.

Section 2 of Article X, which requires the levy of annual taxes sufficient to defray the annual expenses of the State and any existing deficit, is manifestly of no relevance to the

problem before us. It expressly refers to "ordinary expenses of the State" and can have nothing to do with capital outlays for permanent improvements. Again the similarity of this public school building program to the plan pursued for many years by the state with reference to permanent road construction is seen. The conclusive authority of the decisions thereabout is inescapable. They will now be fully reviewed.

### The State School Bonds

We now reach, it may be said at long last, the heart of the issues made by the pleadings, to which relator refers in the brief as the crux of his case. Article X, section 11, forbids the creation by the General Assembly of any debt or obligation, except for ordinary and current business of the State, without submission of the question to the qualified electors at a general election, and a favorable two-thirds majority vote of those participating, with other now irrelevant details. However, the long line of decisions, which will be cited, have established beyond peradventure of doubt at this late day that the provision is not applicable to bonds which the authorizing statute provides shall be paid from a special fund or source which is set aside for the purpose and which is reasonably estimated to be sufficient therefor.

As expressed in our earlier authorities, the framers of the Constitution of 1895 had in mind indebtedness which should have to be paid from the proceeds of annual tax levies upon property. Morever, as also said by this court before, general liability in special fund cases is contingent in nature and would become effective only upon failure of the special fund and to the extent only of such failure. Incidentally, it is noteworthy that no case of such a defection has found its way to this court despite the many years of practice, and we know of none. The plan of the law in hand is set forth in sections 8 through 22 of Article IV of the Act, to which reference may be had. Section 13 is here quoted, as follows: "For the payment of the principal and interest on all State

School Bonds, whose issuance is authorized pursuant to the provisions of this Article, there shall be pledged the full faith, credit and taxing power of the State of South Carolina, and in addition thereto, but subject to the provisions of this section, the entire amount of revenue derived from the retail sales tax levied by this act. The revenues derived from the retail sales tax during each fiscal year shall be discharged from the foregoing pledge when payment or provision for payment has been made for the principal and interest of all State School Bonds maturing in such fiscal year and when the requirements of Section 21 as to payments in the sinking fund have been met. The pledge of such revenue derived from such retail sales tax shall not preclude the revision of such retail sales tax as to rate or as to the item taxed, either or both, if the State Auditor shall certify that his estimate of the revenue to be derived annually from the tax as thus revised will not be less than one hundred and fifty per centum (150%) of that sum which is equal to the maximum annual principal and interest requirements on all State School Bonds outstanding, or then requested to be issued on the date such certificate bears. Such certificate shall be appended to the Enrolled Act and be presented to the Joint Assembly of the General Assembly on the occasion such Act is presented for ratification."

Consideration of the Act leaves no doubt that the framers carefully provided for anticipation of the principal and interest requirements for complete service of the bonds which may be issued under its terms, which answers petitioner's point that the constitutional requirement of an annual tax sufficient to pay interest has not been met. The very substantial prospective amount of the special fund, which is set up by the Act, is authenticated in the Return of respondents which contains as an exhibit comparative figures from the experience of the comparable States of Alabama and Tennesssee which have similar retail sales taxes, and after allowance for stated differences in the rates and exemptions which are contained in the laws of those

States and this, and the factors of relative population and per capita income, a competent and experienced member of the South Carolina Tax Commission has estimated that the annual income from the sales tax in this State, which is levied by the law under attack, will be about thirty million dollars.

The intent of the Act is plain with respect to the issuance, security and payment of the State School Bonds. It follows the scheme approved time after time in the decisions of this court, of a special fund which in this instance will be derived from the proceeds of the companion retail sales tax which are pledged first to the payment of the principal and interest of the bonds. Such is common practice in State financing. 49 Am. Jur. 280, sec. 67. Annotation, 100 A. L. R. 900. The validity of it is firmly established in the law of this State, as said. It was clearly defined in *Briggs v. Greenville County,* 137 S. C. 288, 135 S. E. 153, 158, opinion by Mr. Justice Cothran, as follows: "This court has held a number of times that obligations * * * secured by the pledge of a fund which might reasonably be expected to be sufficient to meet the obligations without resorting to the levy of a property tax, did not constitute bonded debt within the meaning of the constitutional limitations, notwithstanding that the full faith, credit, and taxing power of a political subdivision were pledged for the payment of the obligations."

Earlier decisions of the same import which related to cities and counties are: *Lillard v. Melton, en banc,* 103 S. C. 10, 87 S. E. 421; *Brownlee v. Brock,* 107 S. C. 230, 92 S. E. 477; *McIntyre v. Rogers,* 123 S. C. 334, 116 S. E. 277; *Barnwell v. Matthews,* 132 S. C. 314, 128 S. E. 712; and *Sullivan v. City Council of Charleston, en banc,* 133 S. C. 189, 130 S. E. 876, 133 S. E. 340. Practically concurrent with the *Briggs* case was *Evans v. Beattie,* 137 S. C. 496, 135 S. E. 538, which involved a highway district; and subsequent: *State ex rel. Richards v. Moorer, en banc, supra,* 152 S. C. 455, 150 S. E. 269, certiorari denied, 281 U. S. 691, 50 S. Ct. 238, 74 L. Ed. 1120, which was concerned

with the validity of State highway bonds for the payment of which gasoline and motor license taxes were pledged, as were also *State ex rel. Williamson v. Richards,* 158 S. C. 534, 155 S. E. 890, *State ex rel. Crawford v. Stevens,* 173 S. C. 149, 175 S. E. 213, and *State ex rel. Coleman v. Lewis, supra,* 181 S. C. 10, 186 S. E. 625; *Crawford v. Johnson,* 177 S. C. 399, 181 S. E. 476; *Arthur v. Johnston,* 185 S. C. 324, 194 S. E. 151, and *Crouch v. Benet, supra,* 198 S. C. 185, 17 S. E. (2d) 320, in which other State obligations for various public building purposes, based upon sundry revenues, were also unsuccessfully attacked as violative of the constitution. Two members of the court as now constituted participated in the unanimous decisions in the three last cited cases; and the present Chief Justice was the author of the opinion in *Arthur v. Johnston* (185 S. C. 324, 194 S. E. 151). In *Crouch v. Benet* (198 S. C. 185, 17 S. E. (2d) 320) there was provision for a special fund bond issue for State hospital buildings, which was unsuccessfully attacked on the ground that it was improperly included in the annual State General Appropriation Act, as here; validity of the special fund doctrine was not even raised as it was directly, and decided, in the closely preceding cases of *Crawford v. Johnston* and *Arthur v. Johnston.*

Justices Blease and Cothran dissented from the decision in the hotly contested *Moorer case,* wherein the special fund doctrine was upheld with respect to State highway bonds and which is our leading case on the subject, but in the closely following *Williamson case* they concurred and expressly said that they were bound by the *en banc* decision of Moorer's case. Mr. Justice Blease said (158 S. C. 549, 550, 155 S. E. 895) : "I am bound, by the decisions of the court *en banc* * * *. I have no right at this time, under the Constitution of the state, to question the correctness of the decision of the court *en banc.* Being so bound, I must, and do, concur". And Mr. Justice Cothran added (158 S. C. 548, 549, 155 S. E. 895) : "* * * I recognize, of course, that the decision of the court *en banc* in * * * *State*

*ex rel. Richards v. Moorer,* 152 S. C. 455, 150 S. E. 269, is binding upon this court, the finality of which decision I have not the slightest disposition to question; and upon this point I concur fully in the concurring opinion of Mr. Justice Blease."

These able and distinguished members of the Court as then constituted doubtless had mental reference in the foregoing declarations to the folllowing sentence which is quoted from sec. 12 of Art. V of the Constitution of 1895, which relates to this Court and particularly to courts *en banc:* "The decision of the Court so constituted, or a majority of the Justices and Judges sitting, shall be final and conclusive." Like our illustrious predecessors, we are bound by the precedent of the decision of the court *en banc* in *State ex rel, Richards v. Moorer;* and stronger bound than by the usual rule of *stare decisis* because failure to follow it might well be said to amount to an amendment of the constitution, which of course no court would wittingly undertake to make.

Later, and after he became Chief Justice, Mr. Justice Blease wrote the opinion for the unanimous court in *State ex rel. Crawford v. Stevens, supra,* 173 S. C. 149, 175 S. E. 213, 216, and said: "Assuming, however, that the state highway commission had authority to pledge the general credit of the state to pay these obligations, there is no violation of section 11, art. 10, in that these gasoline and license taxes constitute a fund which may reasonably be expected to be sufficient to meet the matured obligations without resorting to property tax"; for which he cited as authority the *Sullivan, Briggs, Evans,* and *Richards (Moorer) cases,* all *supra.*

Years after the doctrine was fully developed in the decisions of this court it was again applied to State highway obligations and clearly re-stated by Mr. Justice Fishburne in *State ex rel. Coleman v. Lewis, supra,* 181 S. C. 10, 186 S. E. 625, 632, as follows:

"The petitioner concedes, as he must, that the issuance of the certificates of indebtedness authorized under this act would be under circumstances similar to those under which previous certificates of indebtedness have been issued, and recognizes the binding effect of the decisions of this court construing these provisions of the Constitution in the case of *State ex rel. Richards v. Moorer, supra.* It is contended, however, that in a question of this nature, involving the construction of organic law, and where there is presented for the consideration of the court a question of constitutional limitation upon legislative power, the doctrine of *stare decisis* is not applicable.

"This section of the Constitution has been construed by this court in a long line of decisions, most of which, if not all, are referred to in the case of *State ex rel. Richards v. Moorer, supra,* and this court will not now depart from the holdings therein announced.

"We have consistently held that bonds issued by the state or its political subdivisions which are payable out of special funds do not create debts of the state or its political subdivisions, although the full faith, credit, and taxing powers of the state or its political subdivisions are pledged for the payment of the same, where the revenues provided for are reasonably sufficient to pay the principal and interest of the obligations incurred."

Judicial followers of binding precedents, particularly those involving constitutional interpretation, upon which all in interest have the right to rely, may with honesty and propriety consider that they would have decided contrariwise had they been in their predecessor's places; but they should follow nevertheless. The thought is well expressed in *State ex rel. Van Alstine v. Frear,* 142 Wis. 320, 125 N. W. 961, 964, 20 Ann. Cas. 633, as follows: "Decisions on constitutional questions that have long been considered the settled law of the state should not be lightly set aside, although this court as presently constituted might reach a different conclusion if the proposition were an original one.

As is said in *Fisher v. [Horicon Iron &] Mfg. Co.*, 10 Wis. 351, 355: 'It is the duty of this branch of the government to pass finally upon the construction of a law, and determine whether the Legislature in its action has transcended its constitutional limits, and the community has a right to expect, with confidence, we will adhere to decisions made after full argument and upon due consideration."

The danger of the special fund doctrine is quite easily seen. Conceivably, successive General Assemblies might similarly pledge, one by one, all available sources of public revenue to service bonds to finance their favored projects, and leave the State unable to meet its ordinary expenses. Incidentally, this particular danger appears to be no more or less whether the bonds be secured by pledge of special funds alone or accompanied by pledge of full faith, as here. Dissenting members of the Supreme Court *en banc* of the distant State of Washington envisioned that possibility with respect to this State in *Gruen v. Tax Comm.*, 35 Wash. (2d) 1, 211 P. (2d) 651, 691, and sounded the warning "Stop! Look! Listen!" The several opinions in that case constitute the most exhaustive and most valuable authority on the special fund doctrine which we know, other than our own decisions. The majority of the court there upheld the constitutionality of a veterans bonus bond issue of eighty million dollars to be paid from the proceeds of a sales tax on cigarettes.

The following comment from the opinion in *Ashmore v. Greater Greenville Sewer Dist.*, 211 S. C. 77, 102, 44 S. E. (2d) 88, 99, 173 A. L. R. 397, is not without application here: "It is suggested that there is danger in the possibility that overlapping subdivisions may result in an unbearable burden of taxation, a pyramiding of levies. The answer is the power of the General Assembly to control. The reins of taxation rest in the hands of the members; they are the representatives of the people whom they face in frequent elections. In the latter lies the means of protection of the taxpayers, if needed. If it was an inadvertence of the framers of the

constitution that there is not more control in the fundamental law, the omission cannot be supplied by the court. *Lillard v. Melton, supra,* 103 S. C. 10, 87 S. E. 421." In the same vein it was said at the conclusion of the majority opinion in *Gruen v. Tax Comm., supra,* 211 P. (2d) at page 686: "Some fear has been expressed that, with this decision before them, the legislatures of the future will allocate so many of the excise taxes to special purposes that the general fund will be entirely depleted. There are several answers to this question.

"In the first place, it is none of this court's concern, because the state's fiscal policy has been by the constitution delegated to the legislature and not to this court. Second, the people have the right of referendum. Third, we have had thirty-one regular, and many special sessions of our legislature, and the general fund has not been depleted by special fund acts, though the pattern was set by the act of 1889-90 to which we have heretofore referred. And, finally, we must have faith in the honesty and integrity of future legislatures —a faith that is justified by the experience of the past."

In final analysis there should in good morals be little difference between our now long-established rule that the irrevocable pledge of the proceeds of a special fund, derived otherwise than from property taxes, which is reasonably estimated to be sufficient to pay principal and interest of bonds renders the bonds not such in the constitutional sense, despite the pledge of the full faith and taxing power of the State, and the contrary rule prevailing in other jurisdictions. This is for the reason that it is not believed that a State in this enlightened day would allow its so-called revenue bonds to go unpaid, irrespective of its technical, legal liability. For instance, it is hardly to be supposed that the great State of Washington would permit default in its cigarette tax-supported veterans' bonus bonds, though they be not general State obligations. Nevertheless, the device is highly desirable because bond buyers pay higher prices for bonds in the nature of general obligations than for restricted revenue

bonds, as heretofore suggested in our former decisions. Thus it may be said that our rule is of practical advantage, without sacrifice of principle.

Relator also cites section 7 of Article X of the Constitution which forbids the issuance of, quoting, "scrip, certificate or other evidence of State indebtedness * * * except for the redemption of stock, bonds * * * previously issued, or for such debts as are expressly authorized in this Constitution." This provision is without relevance here. It is a fragment of an article of the antecedent Constitution of 1868, inserted in the Constitution of 1895 without its context, on which account it is generally considered inapplicable to State bonded debt. The ground and force of this conclusion are admirably stated in an article in Vol. 3, No. 3, of the South Carolina Law Quarterly, pp. 311-315, March 1951.

It is argued that the special fund doctrine is here inapplicable because the sales tax has no relation to the object for which the proceeds of the bonds are to be expended, namely, public school buildings and transportation of pupils. Similar point was made and expressly overruled in *Crawford v. Johnston, supra,* 177 S. C. 399, 181 S. E. 476, and *Arthur v. Johnston, supra,* 185 S. C. 324, 194 S. E. 151. It is also said that no fund in fact has been established, or a reasonably sufficient source of funds set aside. The terms of the Act demonstrate that these objections are untenable. Sec. 13 of Art. IV is set out *supra*; sec. 12 is as follows:

"If the following shall appear to the satisfaction of the Governor and the State Treasurer from the foregoing request:

"(1) That the amount of revenues derived from the retail sales tax received during the next preceding fiscal year, or until information with respect to the same becomes available, that the Commission's estimate of the amount of revenue to be derived from the retail sales tax during the cur-

rent fiscal year will, if received annually thereafter, be sufficient to pay as they fall due, the principal and interest of said proposed State School Bonds, and all other State School Bonds theretofore issued; and, if it shall also appear:

"(2) That the amount of revenues estimated by the Commission to be received during the term for which said proposed State School Bonds will be outstanding will be sufficient to pay as the same respectively mature, the principal and interest of said State School Bonds and of all other State School bonds theretofore issued;

"(3) * * *

"(4) * * *

"(5) That the issue will be within the limitations prescribed by Section 9 (which are, interpolated, $75,000,000-.00 (for buildings) at any one time and $7,500,000.00 for transportation.) it shall be the duty of the Governor and the State Treasurer to issue State School Bonds in accordance with said request."

A subsidiary issue is made with respect to the obligations of local school districts and other operating units to the State by reason of advancements by the latter for building and like purposes. The question will be answered by consideration of the relevant terms of the Act, which are contained in Art. IV, sec. 6, as follows: "Whenever the Commission shall determine that any operating unit needs capital improvements to an extent in excess of any credit due such operating unit by the Commission, the Commission shall be empowered to advance or lend said operating unit such sums as in the opinion of the Commission are necessary to be expended for capital improvements by said operating unit. Such loans or advances shall bear interest at the rate of two and one-half per centum (2 1/2%) per annum (provided, that if the state shall pay an average rate of interest of more than two and one-half (2 1/2%) per centum, then the rate of interest charged on such advances or loans shall be increased accordingly), shall be evidenced by appropriate agreements, and shall be repayable, both principal and in-

terest, by the operating unit solely from the annual grants to which the operating unit shall become entitled. Such loans shall not constitute a debt of the operating unit within the meaning of any provision or limitation of the Constitution or Statutes of the State of South Carolina: Provided, always, that the Commission shall not advance or lend to any operating unit any sum in excess of seventy-five per centum (75%) of the estimated sum which will accrue to the said operating unit on account of grants to be made to the said operating unit within the twenty (20) years next following the date of the advance, or on or before July 1, 1976, whichever shall first occur. In estimating such grants, the Commission shall assume that the average daily attendance in the schools of the operating unit for the past preceding fiscal year will continue for the period during which the loan is to be repaid."

The "annual grants" referred to in the foregoing are provided to be made by the State to each local school operating unit at the rate of $15.00 per pupil in attendance during the preceding school year, for construction and maintenance of physical facilities or for payment of debts therefor. Art. IV, sec. 1. The "special fund" which will be created by the annual State grants removes the advances from the constitutional debt limitations. It is noted that they are solely payable by that method. The point is so plainly without merit that it need not be further considered, especially in view of the rather full discussion hereinbefore of the special fund doctrine and its undoubted applicability to the debt features of this case. The grant and refund plan would seem to be about the highway reimbursement scheme (which was followed before the issuance of State highway bonds—see *Briggs v. Greenville County, supra,* 137 S. C. 288, 135 S. E. 153) in reverse.

### The Sales Tax

Apparently the present Act represents the first venture of this State in the field of taxation of retail sales generally although we have long had taxes upon the sales of selected

articles such as gasoline, soft drinks and tobacco products (Secs. 2505, 2527, 2532, Code of 1942) which are termed selective sales taxes. 47 Am. Jur. 195, Sales and Use Taxes, Sec. 1. (There is little or no difference in incidence and burden from the taxes on the imports of our colonists-ancestors. The rate on "dry goods" was then also three per cent. McCrady's South Carolina Under Proprietary Government 482.) However, general sales taxes are now common in the States and municipalities, so much so that the cited and other encyclopedias give the subject separate treatment from that of the other manifold forms of taxation. There is a valuable series of annotations on the subject of the validity of sales taxes in 89 A. L. R. 1432, 110 A. L. R. 1485, 117 A. L. R. 846, and 128 A. L. R. 893. Decisions invalidating any features of them are comparatively few, as is seen by reference to the multitude of cases contained in these citations.

Article VII of the Act contains the sales tax provisions which have been attacked by relator in specified particulars. They will be considered in his order of presentation in the brief.

In the definitions contained in subarticle I a retailer or seller is defined at length and at the end is the following provision: "When in the opinion of the Tax Commission, it is necessary for the efficient administration of this act, to regard any salesman, representatives, truckers, peddlers, or canvassers as agents of the dealers, distributors, supervisors, employers or persons under whom they operate or from whom they obtained the tangible personal property sold by them regardless whether they are making sales on their own behalf or in behalf of such dealers, distributors, supervisors, employers, or persons, the Tax Commission may so regard them and may regard such dealers, distributors, supervisors, employers, or persons as retailers for purposes of this act."

Relator contends that the foregoing amounts to an unconstitutional attempt to delegate legislative power to an administrative agency of the executive department. Like many other of the sales tax provisions contained in the Act, this is manifestly intended to furnish means to the enforcement agency to prevent evasion of the tax. It vests in the Commission limited discretionary power when in its opinion, quoting, "it is necessary for the efficient administration of this Act." Part of the limit is the restriction as to whom the Commission may classify as retailers for the purpose of the Act, as stated in the quoted provision. We think it well within the rule of *Clarke v. S. C. Public Service Authority,* 177 S. C. 427, 181 S. E. 481, 488, as follows: "While the Legislature may not delegate its powers to make laws, it may vest in administrative officers, agencies of government, commissions, and bodies a large measure of discretionary authority in matters relating to the administration and execution of statutes and it may delegate to others powers which it might rightfully exercise itself. *State v. Moorer, supra.* This court has in many instances held that delegations of powers to perform administrative and ministerial acts were not unconstitutional." (Citing thirteen cases.)

Subarticle II requires every retailer to procure an annual license upon payment of a fee of $5.00 for the first store and an additional $5.00 for each branch, other establishment or agency so that the thirtieth such license would be $150.00 per annum and the same amount for each above thirty. It appears to be quite similar to, and intended to supplant, the "chain store" tax now contained in Sec. 2556 of the Code of 1942, the constitutionality of which has been upheld. *Southern Grocery Stores v. Tax Comm., D. C.,* 55 F. (2d) 931.

Relator's complaint is that it violates Sec. 1 of Article X of the Constitution of 1895 which contains the following: "the General Assembly may provide for a graduated tax on incomes, and for a graduated license on

occupations and business". Although it is graduated on the number of stores, the criticism is that it is not a perfect or limitless graduation and thereby transgresses the letter of the quoted provision. But it has been held that the constitutional word "may" is permissory or advisory and the legislature is not restricted at all to graduation in such cases. To that effect are: *Alderman v. Wells,* 85 S. C. 507, 67 S. E. 781, 27 L. R. A., N. S., 864, 21 Ann. Cas. 193; *State v. Reeves,* 112 S. C. 383, 99 S. E. 841; *Marshall v. Tax Comm.,* 178 S. C. 57, 182 S. E. 96, certiorari denied 296 U. S. 585, 56 S. Ct. 96, 80 L. Ed. 413; and *Carolina Music Co. v. Query,* 192 S. C. 308, 6 S. E. (2d) 473.

Subarticle III contains ceilings upon the three per cent tax otherwise applicable whereby the total amount of the tax is limited upon the sale of any one article to $25.00 total tax on any article not exceeding $1,500.00 sales price, $40.00 on any higher article not exceeding $3,000.00 sales price, and finally $75.00 on any which sells above $3,000.00. Relator complains and cites Sec. 6 of Article I of the Constitution, as follows: "All property subject to taxation shall be taxed in proportion to its value." But this provision is inapplicable to license or excise taxes, which the sales tax is. *Hay v. Leonard,* 212 S. C. 81, 46 S. E. (2d) 653. An excellent differentiation of these forms of taxes, supported by many citations, is found in our decision of *Gregg Dyeing Co. v. Query,* 166 S. C. 117, 164 S. E. 588, affirmed, 286 U. S. 472, 52 S. Ct. 631, 76 L. Ed. 1232, 84 A. L. R. 831, in which it was held by this court that a tax on the use and consumption of gasoline is an excise and not a property tax, and the levy was upheld by both courts after vigorous contest.

In the consideration of this and other tax features of the broadside assault upon the Act there should be kept in mind the principle which was expressed in *Santee Mills v. Query,* 122 S. C. 158, 115 S. E. 202, as follows: "Except in so far as it is limited by the state and federal Constitutions, the taxing power of the state is gen-

eral and absolute and extends to all persons, property, and business within its jurisdiction or reach." In general, the sales tax is an imposition upon the privilege of the business of selling at retail and measured by the amount of business done, which is a clear case of an excise tax to which the constitutional provisions relating to property taxes are irrelevant. The decided cases of this and other jurisdictions, State and Federal, are substantially in accord on this point.

Next subjected to relator's criticism as unconstitutional are the exemptions from the sales and use tax levies which are contained in subarticles III and IV. They are numerous, it must be admitted, and include sales of property or gross receipts of business which the State may not tax under its and the United States Constitution; school and college text books; livestock, poultry and livestock feeds, insecticides, fertilizer, seeds or seedlings for garden or farm use; boxes, crates, bagging and barrels used to contain agricultural, dairy, grove, garden and resin and turpentine products for market; newsprint, newspapers, religious publications including the Bible; coal, coke and other fuel sold to manufacturing, electric power and transportation companies for their consumption; non-profit school lunches; communications, transportation or water, of such nature that the price is regulated, when sold by public utilities, by the Public Service Commission; fuel, lubricants and mechanical supplies for use on ships; wrapping paper, twine, paper bags and containers; the portion of the sales price of automobiles, furniture or appliances represented by trade-in allowances; gasoline or other motor fuel already taxed at the rate of gasoline; animal or motor drawn or operated machinery used in farming, mining, quarrying, compounding, processing and manufacturing tangible personal property, including parts therefor but expressly excluding automobiles and trucks; fuel used in the curing of farm products; electricity; railroad cars, locomotives and parts; vessels and barges of more than fifty tons burdens; and farm, grove, vineyard or garden products when sold in the original state or preparation for sale and sold by the producer or by members of his family.

Question is not here made as to the validity or meaning of any one or more of the stated exemptions so the foregoing recital is not to be taken as complete or entirely accurate. Exactness of description of the exemptions is unnecessary for the present consideration of them.

Relator invokes the "privileges and immunities", due process and equal protection clauses of the Constitution of 1895, which are contained in Sec. 5 of Article I. His argument is that the exemptions from the tax result in discrimination against sales subject to the tax, which renders it invalid. As long as the list of exemptions is, it does not compare in length to a supposed list of "exemptions" from our selective sales tax laws, yet no one would now contend that they are unconstitutional on account of resultant discrimination. The most of the brief upon the question is devoted to the alleged favoritism of farmers. But they have long been favored in taxation and other fields of leigislation, which has been generally approved by the courts. *State ex rel. Edwards v. Query,* 207 S. C. 500, 37 S. E. (2d) 241, and earlier authorities there cited. 47 Am. Jur. 204 *et seq.*

To invalidate a tax statute for discrimination, in the absence of specific constitutional inhibition, exemption from its terms must be purely arbitrary, which cannot be fairly said of the exemptions contained in the Act before us. It was said in *Marshall v. Tax Comm., supra* (178 S. C. at page 62, 182 S. E. at page 98) upon the authority of numerous cited decisions of the U. S. Supreme Court: "The plaintiff must be able to satisfy the court that the classification (of income for State taxation) has its origin in nothing better than whim and fantasy and tyrannical exercise of arbitrary power, before the tax in question will be stricken down." In *Gregg Dyeing Co: v. Query, supra,* this Court quoted with approval the following from the leading case of *Hart Refineries v. Harmon,* 278 U. S. 499, 49 S. Ct. 188, 189, 73 L. Ed. 475: "Statutes which tax one class of property while exempting another class necessarily result in imposing a greater burden upon the property taxed than

would be the case if the omitted property were included. But such statutes do not create an inequality in the constitutional sense. Nor is the imposition of an excise tax upon one occupation or one activity from which other and different occupations * * * are exempt, a denial of equal protection. It is enough if all in the same class are included and treated alike. These propositions are so firmly established by repeated decisions of this court that further discussion is unnecessary (citing numerous other decisions of the United States Supreme Court)."

Other decisions of this court of like effect are: *Curdts v. Tax Comm.*, 131 S. C. 362, 127 S. E. 438, affirmed, 273 U. S. 669, 47 S. Ct. 471, 71 L. Ed. 831; *Duke Power Co. v. Bell*, 156 S. C. 299, 152 S. E. 865; and *Wingfield v. Tax Comm., supra*, 147 S. C. 116, 144 S. E. 846, in which latter the State license or excise tax on soft drinks, theatre admissions, etc., was upheld against attack very similar in this feature to the case in hand.

The last point of relator's attack upon the validity of the sales tax appears to be a makeweight and it deserves only scant attention. It is that the effect of sections 6 and 12 of Article XI, Education, of our Constitution is to confine the State's financial support of the public schools to the proceeds of the poll tax and the tax upon the sale, or license for the sale, of intoxicating liquors or beverages. The concluding sentence of Sec. 6 negates relator's contention. It is: "Any school district may by the authority of the General Assembly levy an additional tax for the support of its schools." It is within general knowledge that all, or practically all, school districts of the State have additional property tax levies which are so authorized, many quite burdensome, to support their respective schools. An excise tax for the purpose has been approved. *Hay v. Leonard, supra,* 212 S. C. 81, 46 S. E. (2d) 653.

As said in substance at the outset of this opinion the legislative power of the General Assembly is plenary and to

upset a statute one must point to a constitutional provision which is undoubtedly violated, and this may be safely repeated without the necessity of citation of authority. It is applicable to all litigations relating to the constitutionality of legislative acts, and peculiarly so to the point just mentioned.

## The Use Tax

Subarticle IV of Article VII of the Act levies a use tax which is manifestly for the purpose of preventing evasion by purchases at retail from without the State or under other circumstances which might or would avoid application of the retail sales tax. The use tax thus complements the sales tax. Relator again cites section 5 of Article I of the State Constitution and also sec. 8 of Article I of the United States Constitution, paragraph (3), the commerce clause. However, the contention is untenable on its face with respect to the State Constitution because if a resident buying at retail from without the State should thereby escape the burden of the sales tax he and the seller would, in effect, obtain "undue" process and receive more than equal protection of the laws; and if the local use of an article purchased outside is taxed in the amount applicable to a local sale of it, all will have fared equally under the law.

We have long had a use tax on gasoline which complements the tax on sales of it in the State. Sec. 2512 of the Code. upheld against similar attack to that here in *Gregg Dyeing Co. v. Query, supra,* 166 S. C. 117, 164 S. E. 588; affirmed City of *Greenville v. Query,* 286 U. S. 472, 52 S. Ct. 631. 76 L. Ed. 1232, 84 A. L. R. 831; and *City of Greenville v. Query,* 166 S. C. 281, 164 S. E. 844. Likewise there is a separate use tax on tobacco and other products which are included in our selective sales taxes. Sec. 2555-2. Code of 1942. Thus use taxes are not novel in this State.

The federal question appears to be likewise untenable. Decisions of the Supreme Courts of the United States and many States are collated in annotations in 129 A. L.

R. 223, and 153 A. L. R. 609. A well-considered decision subsequent to the last cited annotation is *Johnston v. Gill*, 224 N. C. 638, 32 S. E. (2d) 30, 33, which involved mail-order tailoring. The court concluded quoting from the opinion, as follows: "We are constrained, therefore, to hold that the tax here in controversy is to be classified as a use tax and that, under controlling decisions of the U. S. Supreme Court, it is not open to attack on constitutional grounds.
\* \* \*

"As the tax collected from the plaintiff comes within the designation 'use tax' and the Supreme Court of the United States is now firmly committed to the validity of such a tax, *Henneford v. Silas Mason Co.*, 300 U. S. 577, 57 S. Ct. 524, 81 L. Ed. 814; *Nelson v. Sears Roebuck Co.*, 312 U. S. 359, 61 S. Ct. 586, 85 L. Ed. 888, 132 A. L. R. 475; *Nelson v Montgomery Ward & Co.*, 312 U. S. 373, 61 S. Ct. 593, 85 L. Ed. 897; *General Trading Co. v. State Tax Commission, supra,* we conceive no valid reason why the judgment below should not be sustained."

It is at least doubtful whether facts are before us in this action which are sufficient to entitle relator to validly raise the constitutionality of the use tax, if question were made of his capacity which has not been done. For that reason and because it is argued, we consider the status of the Act if the use tax provision were stricken. Incidentally, the estimated annual proceeds of the use tax are comparatively small—not over one million dollars—so only the amount of the school bonds which may be issued and outstanding at any one time would be affected and that not in substantial proportion of the whole otherwise available (from the sales tax).

While the use tax is complementary to the sales tax, as observed above, it is by no means essential to the validity of it. If the terms of the Act relating to the use tax were eliminated, for which relator has offered no ·valid reason, the Act would remain complete, capable of being executed independently of the use tax provisions and without doing undue

violence to the legislative intent. Thus the situation comes within the rule that the Act would not be vitiated by rejection of the use tax as unconstitutional. The well settled rule thereabout was very fully discussed in both opinions in the recent case of *Parker v. Bates,* 216 S. C. 52, 56 S. E. (2d) 723, which alone need be cited. Section 31 of subarticle V of the Act is a separability or saving clause which it is quite clear should be given effect in accord with the expressed legislative intent if occasion arose for the application of it.

## Conclusion

It is concluded without difficulty, as stated at the outset, that none of relator's many points is meritorious. All are foreclosed in principle against him by former decisions of this and the federal courts, many of which have been cited and their application shown. The General Appropriation Act of the Legislature of 1951, approved April 19, 1951, is a valid enactment of the General Assembly; the retail sales and use tax therein imposed is a proper exercise of the taxing power of the State; and the State School Bonds which are authorized will, when issued, constitute obligations of the tenor and terms set forth in the Act.

The petition of the relator is overruled *in toto,* and the action dismissed.

BAKER, C. J., and FISHBURNE, TAYLOR and OXNER, JJ., concur.

OXNER, Justice (concurring).

I am in full accord with the well considered opinion of Mr. Justice Stukes, but desire to make this personal observation: If the question were an open one in this State, I would unhesitatingly say that the portion of the Act authorizing the issuance of bonds, to the payment of which is pledged the full faith, credit and taxing power of the State of South Carolina, without submission of that question to the qualified electors of the State, violates Section 11, Article 10 of the Constitution, under the terms of which the Gen-

eral Assembly is forbidden "to create any further debt or obligation, either by the loan of the credit of the State, by guaranty, endorsement or otherwise, except for the ordinary and current business of the State," without obtaining the approval of two-thirds of the qualified electors. But that feature of the case is controlled by the decision of the Court *en banc* in the case of *State ex rel. Richards v. Moorer,* 152 S. C. 455, 150 S. E. 269. I do not agree with the interpretation which the Court there placed upon the foregoing section of the Constitution but am bound by that decision. It is too late now to question the doctrine there established.