16774

ARTHUR v. BYRNES, GOVERNOR ET AL.

(77 S. E. (2d) 311)

52

*Messrs. Robinson, Robinson & Dreher,* of Columbia, *for Petitioner,*

*Messrs. T. C. Callison, Attorney General, and James S. Verner, Assistant Attorney General,* of Columbia, and *Sinkler, Gibbs & Simons,* of Charleston, *for Respondents,*

August 18, 1953.

OXNER, Justice.

This is a taxpayer's suit brought in the original jurisdiction of this Court for the purpose of determining the validity of certain bonds proposed to be issued under an act of the General Assembly approved by the Governor on April 2, 1953, —— St. at Large, p.   ..., entitled: "An Act to Provide for the Issuance by the State of South Carolina of its State Institution Bonds, To Prescribe the Conditions Under which Said Bonds May be Issued, to Prescribe the Purposes for Which their Proceeds Shall be Expended at the Several State Supported Institutions of Higher Learning, To Make Provision for the Payment of Said Bonds, and to Make Appropriations to Certain State Institutions and Agencies for Permanent Improvements."

The foregoing Act authorizes the issuance of bonds, the aggregate amount of which shall not exceed $14,000,000.00, for the purpose of constructing buildings and making other permanent improvements at the University of South Carolina, Clemson College, The Citadel, The Medical College, Winthrop College, and the Colored Normal, Industrial, Agricultural and Mechanical College. It contemplates that the principal and interest of these obligations shall be paid from the tuition fees of the respective institutions at which the improvements are made, but there is also pledged the full faith, credit and taxing power of the State of South Carolina. The procedure to be followed by any state institution desiring to make permanent improvements is briefly as follows:

The board of trustees is required to file an application with the State Budget and Control Board, hereinafter referred to as the "State Board", setting forth a description of the contemplated improvement, the estimated cost, the number of students enrolled at such institution, the tuition fees charged, a suggested maturity schedule for the bonds proposed to be sold, and a statement of unmatured bonds theretofore issued. The application must also contain an agree-

ment on the part of the trustees that the schedule of tuition fees shall be revised from time to time and whenever necessary to take care of the annual principal and interest requirements of all bonds issued for such institution. The State Board, which is empowered to approve, reject or modify such application, is required to determine whether there is a definite and immediate need for such improvement, whether the tuition fees charged by such institution are satisfactory, and whether the "schedule of tuition fees, as applied to the regularly enrolled students at such State Institution, on the basis of the number of students regularly enrolled at such State Institution at the close of the last preceding academic semester or term (exclusive of any summer school semester or term), will, if multiplied by the number of years for which the bonds herein provided for shall be outstanding, result in the production of a sum equal to not less than one hundred ten per cent of the estimated aggregate principal and interest requirements of all State Institutional Bonds issued for such State Institution to be outstanding if such application be approved."

If the State Board is satisfied that there is a definite and immediate need for the improvement requested, that the tuition fees charged at such institution are sufficient to produce funds necessary to meet the principal and interest requirements of the proposed bonds and all outstanding bonds issued for such institution, and to provide the margin above stated, and that the other requirements have been met, it transmits its findings and recommendations to the Governor and State Treasurer along with a request for the issuance of the amount of bonds approved for such institution. It then becomes the duty of the Governor and State Treasurer "to examine the request, and if they jointly approve the same, and, for themselves, determine" that the tuition fees in force at such State Institution are sufficient to meet the requirements heretofore set forth, they are empowered to provide for the issuance of bonds in the amount approved by the State Board. The bonds are then sold by the Governor and State

Treasurer and the proceeds turned over to and segregated by the Treasurer for the account of the state institution for which the bonds are issued. "Each issue of the State Institution Bonds shall mature in annual series or installments, the last of which shall mature not more than twenty years after the date of the bonds, but no bonds shall be issued under the authority of this act to mature after the year 1978."

The tuition fees at each institution are fixed by the board of trustees subject to the approval of the State Board. They must be remitted from time to time to the State Treasurer, who is required to segregate into a special fund all tuition fees of the institution for which bonds are to be issued and to apply same to the payment of the obligation incurred for such institution.

It appears from the stipulation of the parties that Clemson Agricultural College of South Carolina has applied to the State Board for approval of the issuance of $4,000,000-.00 in bonds, the proceeds of which are to be used in making permanent improvements at that institution, and that an application has also been made for a similar purpose by the University of South Carolina for $2,500,000.00. Petitioner attacks the validity of the proposed bonds upon the grounds (1) that the issuance of such bonds would constitute an increase in the public debt of South Carolina without first submitting the question as to the creation of such debt to the qualified electors of the State at a general election, as required by Section 11, Article 10 of the Constitution; (2) that the tuition fees which are to be set aside to pay said bonds are not reasonably sufficient to meet the principal and interest requirements, and (3) that the provisions of the act setting apart said tuition fees as a special fund were impliedly repealed by Section 72 of the General Appropriation Act for the fiscal year 1953-54, which was enacted subsequent to the act under consideration.

It is now well settled that the General Assembly may authorize the issuance of general obligations of the State without submitting the question as to the creation of such debt to the qualified electors as required by Section 11, Article 10, where such obligations are secured by the pledge of a fund established or set aside which is reasonably sufficient to pay such obligations without resorting to the levy of a property tax. In other words, an obligation of such character does not constitute a debt within the contemplation of Section 11, Article 10. *State ex rel. Richards v. Moorer,* 152 S. C. 455, 150 S. E. 269; *Crawford v. Johnston, Governor,* 177 S. C. 399, 181 S. E. 476; *State ex rel. Coleman v. Lewis,* 181 S. C. 10, 186 S. E. 625; *Arthur v. Johnston, Governor,* 185 S. C. 324, 194 S. E. 151; *State ex rel. Roddey v. Byrnes, Governor,* 219 S. C. 485, 66 S. E. (2d) 33.

Petitioner disclaims any purpose of attacking the "special fund" doctrine established by these decisions. It is his contention that the tuition fees pledged for the payment of these bonds are not reasonably adequate to meet the principal and interest requirements, and that accordingly the issuance of these obligations would violate the provisions of Section 11, Article 10 of the Constitution.

While the test laid down in all our decisions is that the special fund or revenue must me "reasonably sufficient" to meet the debt service requirements, there has been no further elaboration of the meaning of the quoted phrase, and in only a few of the numerous cases involving the application of the special fund doctrine has there been an attack upon the sufficiency of the particular fund involved. In *State ex rel. Coleman v. Lewis, supra,* 181 S. C. 10, 186 S. E. 625, the question was raised but apparently not seriously pressed. It was also made one of the issues in the recent case of *State ex rel. Roddey v. Byrnes, supra.* That case involved the validity of State general obligation bonds to finance a program of constructing school buildings and other school facilities for elementary and high schools. To the

payment of these bonds there was pledged the revenues from the sales tax which was imposed in the same legislation. It is of interest to note that it was there provided that the sales tax could not be revised unless the State Auditor found that the annual revenue from the tax as thus revised would not be less than 150% of that sum which was equal to the maximum annual principal and interest requirements on all bonds outstanding.

On the question now presented, little aid can be obtained from the decisions in other jurisdictions. Although a number of courts have held that an obligation payable from a special fund created by the imposition of fees, penalties, or excise taxes is not a debt within the meaning of constitutional debt limitations, in none of these cases, so far as our investigation discloses, was the general credit of the State pledged. The sufficiency of the fund or tax pledged was, therefore, of no serious concern to the taxpayer. Those primarily interested in that question were the purchasers of the bonds. The proposed bonds now under consideration present a different situation. Here there is pledged the full faith, credit and taxing power of the State. Where such is the case, the sufficiency of the fund is of vital interest to the taxpayer and bears directly on the soundness of the credit of the State. In *State ex rel. Roddey v. Byrnes, Governor, supra*, we called attention to the danger involved in the application of the special fund doctrine, although it was there conceded, as it must be, that it is now too late to question the soundness of the decisions relating thereto.

Implicit in all of our decisions involving the application of the special fund doctrine is the assumption that it will never be necessary to resort to general taxation to pay the obligations proposed to be issued. Where general State obligations are to be issued without a vote of the people, if due regard is to be given to Article 10, Section 11 of the Constitution, the phrase "reasonably sufficient" used in so many of our decisions should be construed as meaning that the special fund or revenue pledged will with

reasonably anticipated certainty be sufficient to pay the principal and interest of such obligations.

If the foregoing test is to be applied, by whom is the ■ question of the sufficiency of the special fund to be determined? We held in *State ex rel. Roddey v. Byrnes, Governor, supra* [219 S. C. 485, 66 S. E. (2d) 37], that this "is in the nature of a judicial function," and that while it may be delegated to executive and administrative officers under the Constitution, their conclusion is "subject to court review and reversal in proper cases". Of course, the findings and declarations of the executive and legislative departments of the government with respect to the sufficiency of the fund should be given due consideration. They are persuasive but not binding upon the courts. This of necessity must be true for, as stated by the Supreme Court of Colorado, "if the people's, 'Thou shall not,' can be brushed aside by the simple *ipse dixit* of their servants thus bound, the mandate is impotent. Such a construction, once adopted, breaks the barrier, and future Legislatures, protected by the precedent, might pile up mountains of debt on future generations, resulting in inevitable impoverishment or ruthless repudiation." In re Senate Resolution No. 2, Etc., 94 Colo. 101, 31 P. (2d) 325, 331.

The facts relating to the sufficiency of the fund in ■ controversy will now be considered in the light of the foregoing principles. These facts, which are undisputed, are contained in the pleadings and are a stipulation of the parties. Those relating to Clemson College show that the bonds proposed to be issued for this institution amount to $4,000,000.00 and are to mature over a period of twenty years. At an estimated interest rate of 3%, the total interest requirements during the life of the bonds, according to the schedule filed, is $1,316,250.00 which, when added to the principal of $4,000,000.00 makes a total of $5,316,250.00. The tuition income for the 1951-52 session was $339,319-.76 and the estimate for the current session is $329,000.00 or around $10,000.00 less than that for the preceding year.

If it is assumed that the tuition income for the current year, amounting to $329,000.00, will continue throughout the life of the bonds, the special fund would amount to $6,580,000.00, or something in excess of 123% of principal and interest requirements. The act only requires 110%. However, the margin of safety during the first few years would not be so wide. The principal and interest requirements for 1954 are $295,000.00, or not much less than the current tuition fees of $329,000.00. Such requirements for 1955 are $289,-750.00.

We have been furnished with a table showing the enrollment and tuition fees for Clemson College over the past 25 years. It shows that there was very little variation in the enrollment, which ran around eleven or twelve hundred students, from 1927 to 1935. In no year during this period were the tuition fees as much as $100,000.00. Beginning with the 1935-36 session, there was a rapid increase in enrollment. In that year it was 1535 and the tuition fees collected amounted to $100,656.00. During the following eight years, there was a progressive increase so that by the session of 1942-43 the enrollment was 2370 and the tuition fees collected $186,750.33. In 1943, the tuition fees increased substantially due to the inauguration of certain armed forces training programs. Beginning with the 1946-47 school year, there was a material increase in the amount of tuition fees collected due to the program instituted under the "G. I. Bill", by which these institutions were permitted to charge the out-of-state tuition rate of $250.00 a year to both resident and nonresident students who were obtaining education at Government expense.

In undertaking to forecast the future tuition income at Clemson, some of the years covered in the foregoing table have little value. It includes the period covered by the depression in the early thirties. The increased tuition fees collected from 1943 through 1950 or 1951 were brought about by abnormal conditions which might not occur again. Per-

haps the fairest appraisal can be made from the period of 1935 to 1942, and during the last two years.

We have been furnished with various statistics and reports estimating that over the period of the next ten or fifteen years college enrollments would increase generally over the nation at a rate of approximately 10% a year. It is argued that when this factor is considered in connection with the requirement of the act that the trustees shall increase the schedule of tuition fees whenever necessary to meet principal and interest requirements, tuition fees at Clemson College will be more than adequate to meet debt service requirements. But the considerations mentioned must be weighed in the light of other circumstances. There is the possibility of a change in economic conditions which might seriously affect college enrollments. If a recession in business should cause enrollment at Clemson to approach that which obtained from 1935 to 1941, normal business years during which the highest amount of tuition fees collected for any year did not exceed $188,000.00, the debt service requirements on the proposed bonds could not be met without a substantial increase in tuition fees. Those now charged are very modest (for South Carolina students only $80.00), and considerably less than those prevailing in our denominational colleges and in most state-supported institutions elsewhere. But if the current tuition fees are materially increased, there might be a substantial decrease in enrollment. In the case of male institutions, there is also the uncertainty as to the demands which will be made in the future for military service.

There is necessarily a considerable degree of uncertainty as to the amount of tuition fees which will hereafter be collected at any of these institutions. There are so many imponderables that no one can predict with any degree of accuracy what the pledged income will be over the life of these bonds. Tuition fees are certainly not as stable as revenues derived from the gasoline tax, the sales tax, or other taxes that have been heretofore pledged to secure bonds of

similar character. In the case of the sales tax, as heretofore pointed out, a coverage of 150% was required. After mature consideration, we are convinced that the coverage of 110% provided in the act under consideration is too small to meet the test heretofore laid down for the sufficiency of a special fund involving the issuance of general State obligations.

On oral argument of this case we were furnished with a resolution of the State Board to the effect that no bonds will be approved under this act unless the coverage is not less than 125%, and we are asked for an adjudication as to the sufficiency of this coverage. In determining the validity of the proposed bonds, are we confined solely to the margin provided in the act, or may we fix what we consider to be a proper coverage and sustain the validity of the bonds to the extent permitted by the coverage so fixed? The rule has been established in this State that where the total amount of bonds authorized exceeds the constitutional debt limitation, but a portion of same is within such limit, only the excess will be declared invalid. *Watson v. Livingston,* 154 S. C. 257, 151 S. E. 469. In that case the voters of a school district authorized the issuance of bonds in the sum of $175,000.00. Under the constitutional debt limitation only $167,000.00 could be issued. It was contended under these circumstances that the entire issue of $175,000.00 should be declared invalid, but the Court sustained the validity of the bonds to the extent of $167,000.00 and enjoined the issuance and sale of any bonds in excess of that amount. This principle was also followed in *Ashmore v. Greater Greenville Sewer District,* 211 S. C. 77, 44 S. E. (2d) 88, 173 A. L. R. 397. Also see annotation in 175 A. L. R. beginning on page 852. We think there is a considerable analogy between the situation in these cases and that presented in the instant case. It is our view under these decisions that we may determine the minimum coverage deemed necessary to adequately secure bonds issued under this Act.

Is the coverage of 125% recently determined by the State Board sufficient? In support of the adequacy of this margin, our attention has been called to the fact that only recently the University of South Carolina sold to a syndicate of investment bankers Student and Faculty Housing Revenue Bonds, which were not secured by the general credit of the State, on the basis of a coverage of 125%. We are not familiar with the facts surrounding this transaction and intimate no opinion thereabout. In any event, we are charged with the responsibility of making our own independent investigation and determination of a question of this kind. After mature consideration, we have reached the conclusion that there must be a coverage of at least 150%, rather than 110% as provided in the act and 125% as now suggested by the State Board.

The facts with reference to the University of South Carolina need not be reviewed at length. The proposal is to issue bonds in the sum of $2,500,000.00 extending over a period of twenty years at an estimated interest rate of 3%. The total principal and interest requirements, according to the schedule furnished us, amount to $3,343,750.00. The tuition fees for the current year are approximately $275,000.00, and if continued on this basis over the twenty year period would amount to $5,500,000.00, or approximately 164% of the principal and interest requirements. This we regard as entirely sufficient.

It follows that on the basis of the present tuition schedule, bonds cannot be issued for Clemson College in the amount requested. This we regret. This institution is rendering invaluable service. No doubt there is an immediate and pressing need for the improvements contemplated. But we cannot allow these considerations to influence us in undertaking to determine the sufficiency of the income pledged.

The remaining question on this appeal is petitioner's contention that there is a conflict between certain provisions of the Act under consideration, which was approved on April 2, 1953, and Section 72 of the General Appropriation

64

Act which became effective on April 28, 1953. After careful examination of both acts, we find no conflict. In support of his claim that Section 72 above mentioned diverts revenues previously pledged to the payment of bonds issued for state-supported institutions, petitioner principally relies on the following proviso in said section: "That the University of South Carolina may operate its Law School in the Summer of 1953, both summer school and summer term, as it may be advised, and retain all additional tuition and other fees charged the law students therefor to aid it in such operation."

In Section 71 of the 1952 General Appropriation Act, 47 St. at L. 1731, there was a provision reading as follows: "That the University of South Carolina may operate its Law School in the Summer of 1952, both summer school and summer term, as it may be advised, and retain all tuition and other fees charged the law students to aid it in such operation." It will be noted that the 1952 proviso permits the University to retain "all tuition and other fees charged the law students" to aid in its summer school operations, while the 1953 proviso merely permits the University to retain "all *additional* tuition and other fees charged the law students." (Italics ours.) We are inclined to agree with respondents' construction that "the tuition fee referred to in the 1953 proviso is a tuition fee in addition to the regular tuition fee in effect, and a fee of a sort not impounded in the special fund for the debt servicing of bonds issued on behalf of the University."

But if we are in error in the foregoing construction, we do not think the point is material in view of the fact that the bonds for the University have not yet been sold. The Act provides, Section 9: "Immediately following the determination of the Governor and the State Treasurer to provide for the issuance of State Institution Bonds, the Treasurer shall segregate into a special fund all tuition fees of the State Institution for which State Institution Bonds are to be issued." While in the instant case the Governor and State Treasurer have approved the issuance

of these bonds, none have been sold. We do not think the Act contemplates the segregation of tuition fees earned and collected long prior to the issuance of bonds.

It follows from the foregoing conclusions that valid bonds may be issued for the University of South Carolina in the amount requested but that the full amount requested in behalf of Clemson College cannot be issued on the basis of current tuition fees. It is further adjudged that no application by any state-supported institution for the issuance of bonds under the terms of this Act shall be granted unless it is found, in addition to the other requirements set forth therein, that "such schedule of tuition fees, as applied to the regularly enrolled students at such State Institution, on the basis of the number of students regularly enrolled at such State Institution at the close of the last preceding academic semester or term (exclusive of any summer school semester or term), will, if multiplied by the number of years for which the bonds herein provided for shall be outstanding, result in the production of a sum equal to not less than" 150% "of the estimated aggregate principal and interest requirements of all State Institutional Bonds issued for such State Institution to be outstanding if such application be approved."

BAKER, C. J., and FISHBURNE, STUKES, and TAYLOR, JJ., concur.