## 19699

Mary E. PAINTER et al., Appellants, v. John C. WEST et al., Respondents.

(199 S. E. (2d) 538)

*Harry M. Lightsey, Jr., Esq.,* of Columbia, *for Appellants,* cites :

*Messrs. Daniel R. McLeod, Atty, Gen., Randall T. Bell, Asst. Atty. Gen.,* of Columbia, and *Sinkler, Gibbs, Simons & Guerard,* of Charleston, *for Respondents,* cite:

*Harry M. Lightsey, Jr., Esq.,* of Columbia, *for Appellants, in Reply.*

September 25, 1973.

*Per Curiam:*

The issues to be decided concern the constitutionality of Act No. 1077 of the 1972 Acts of the General Assembly (57 Stat. 2237), wherein the issuance by the State, initially, of $5,000,000.00 in bonds is authorized for the purpose of obtaining funds out of which loans will be made by the State to municipalities and special purpose districts, in order to enable such local units to obtain maximum financial benefit from Federal programs relating to the construction of sewage collection, treatment, and disposal systems.

The Act authorizes the Budget and Control Board to issue so-called revenue bonds in order to raise funds for the foregoing purpose. At the present time, it appears that the anticipated aggregate outlay to be made by way of State aid under the Act will amount to at least twenty-five million dollars, and that the program will extend over a period of five or more years.

The aid granted to the local units, while designated *state grants,* is in effect a loan by the State to the recipients to be repaid by them over a long term. The Act states that the full faith and credit of the State is not pledged to repay the bonds, but the State does pledge to collect from the local units, as hereinafter outlined, amounts sufficient to repay the bonds and also appropriates, initially, from general tax funds the sum of $750,000.00, as a bond reserve fund, to serve as a secondary source for their retirement in case the payments from local units, the primary source, proves inadequate.

When a local unit receives a grant or loan, an *assistance agreement* must be entered into between it and the State Budget and Control Board. This agreement must prescribe the method by which revenues are to be obtained by the local unit to repay the State grant. The Budget and Control Board is authorized to prescribe the method of raising these funds by requiring either the imposition of (1) an ad valorem

property tax on all taxable property within the local unit; (2) a service charge to be collected by the local unit from all users of sewer services therein; and (3) any combination of a property tax and a service charge sufficient to meet the loan repayments. The Act specifies that, when the property tax is agreed to as a means of repayment, it shall be levied by the Comptroller General and shall be deemed a tax imposed by the General Assembly for the benefit of the health and welfare of such local unit.

The foregoing requirements are to assure the repayment of the grants to the local units and these repayments are to be used, in turn, by the State to pay the interest and principal on the bonds as they mature. Under the Act, the State will covenant with the purchasers of the bonds to take remedial action against any defaulting local unit by applying any state aid payments to which the local units would otherwise be entitled until the delinquency has been paid. In the event the local unit is a special purpose district and receives no such state aid, the Comptroller General may levy, and require the applicable County Treasurer to collect and remit to the State, the special tax required under the grant or loan agreement.

If repayments from the local units should prove inadequate, the bond reserve fund will be used to meet the delinquency. The principal amount of State bonds which may be outstanding at any time is limited by the size of the bond reserve fund. This fund must always equal at least 15% of the principal amount of the outstanding bonds. Therefore, the initial appropriation of $750,000.00 by the State to the reserve fund permits the issuance of bonds in the amount of five million dollars to begin the program. The Act states the intention of the General Assembly to make appropriations in the future to increase the amount of the reserve fund, which will automatically increase the amount of bonds which may be issued.

The plaintiffs (appellants) attacked the constitutionality of the Act upon several grounds, among them being the

contention that the Act authorizes the State to incur further debt without an election, in violation of Article 10, Section 11, of the South Carolina Constitution. Since the Act violates this constitutional provision, we find it unnecessary to consider the other grounds urged.

Article 10, Section 11, of the South Carolina Constitution provides:

"To the end that the public debt of South Carolina may not hereafter be increased without the due consideration and free consent of the people of the State, the General Assembly is hereby forbidden to create any further debt or obligation, either by the loan of the credit of the State, by guaranty, endorsement or otherwise, except for the ordinary and current business of the State, without first submitting the question as to the creation of such new debt, guaranty, endorsement or loan of its credit to the qualified electors of this State at a general State election; . . ."

The lower court sustained the position of the defendants (respondents) that the bonds to be issued pursuant to the Act do not constitute a debt of the State, within the meaning of Article 10, Section 11, because of the application of the so-called special fund doctrine. This doctrine is stated in *Arthur v. Byrnes,* 224 S. C. 51, 77 S. E. (2d) 311 [quoted in *Mims v. McNair,* 252 S. C. 64, 165 S. E. (2d) 355], as follows:

"It is now well settled that the General Assembly may authorize the issuance of general obligations of the State without submitting the question as to the creation of such debt to the qualified electors as required by Section 11, Article 10, where such obligations are secured by the pledge of a fund established or set aside which is reasonably sufficient to pay such obligations without resorting to the levy of a property tax. In other words, an obligation of such character does not constitute a debt within the contemplation of Section 11, Article 10."

This section of the Constitution has been construed as applying only to "indebtedness which should have to be paid from the proceeds of annual tax levies upon property." *State ex rel. Roddey v. Byrnes,* 219 S. C. 485, 66 S. E. (2d) 33. Similarly, in *Briggs v. Greenville County,* 137 S. C. 288, 135 S. E. 153, the Court held that "the underlying purpose of the constitutional provisions concerning the creation of state debt was that they should serve as a limit of taxation—as a protection to taxpayers, and especially those whose property might be subjected to taxation." Our prior decisions make it clear that the "debt or obligation" which must be approved by a vote of the people is the type debt which is to be repaid from the proceeds of a property tax. It is true that the Court has at times, as in *Arthur v. Byrnes, supra,* 224 S. C. 51, 77 S. E. (2d) 311, stated that the special fund doctrine applied to those cases where resort could not be had to "general taxation" to repay the bonds. This reference to "general taxation," however, was synonymous with "property taxation" and effected no change in the interpretation of "debt" as found in Roddey and Briggs.

Absent in the instant case is an essential prerequisite to the validity of the bonds under the so-called special fund doctrine, to-wit: a fund established or set aside which is reasonably sufficient to pay the obligations without resorting to the levy of any property tax. To the contrary, there is contemplated and specifically authorized the levy of property taxes, albeit not on a state-wide basis, to raise in substantial part the primary fund for retiring bonds which the State proposes to issue.

The bonds are state bonds and the taxing power of the State is pledged, at least, to the extent of guaranteeing the collection of the taxes from the participating districts. A reserve fund of 15% of the amount of the outstanding bonds is set aside by the State as a guarantee of the timely payment of principal and interest. While there is no absolute commitment to provide additional appropriations to the

bond reserve fund, the Act expresses the belief of the General Assembly "that in future years legislative policy will require the maintenance of the bond reserve fund at a level which will insure the punctual payment of the principal and interest of the State revenue bonds," and imposes the "duty" upon the appropriate State officials to recommend to the General Assembly "that an appropriation for the bond reserve fund be made whenever it shall appear that the value of the cash and securities therein shall be less than the maximum annual principal and interest requirements of all State revenue bonds then outstanding." These provisions constitute an open legislative recognition that the bonds are obligations of the State and of the State's intent to see their payment.

The fact that the Act grants the right to impose the property tax on certain political subdivisions instead of the entire State does not avoid the necessity for compliance with Article 10, Section 11.

It is true that the State may not impose a statewide property tax levy, as such; but there can be no doubt that the primary fund for the repayment of these state bonds may be derived from the levy by the State of property taxes within the local districts which participate in the program. Appellant correctly points out that, if the General Assembly had imposed a statewide millage to provide for repayment, this section of the Constitution would have forbidden the issuance of the bonds. Instead of a statewide tax, however, the Act has authorized property taxation in participating special purpose districts. The General Assembly has the authority to create special purpose districts and, conceivably, much of the State could be carved into such districts. Each would then become eligible to enter the program, thereby becoming subject to the property tax as one of the primary sources of repayment of the bonds. The election requirements of Article 10, Section 11, cannot be avoided in this fashion.

The statute here simply provides a scheme whereby state bonds may be repaid through property taxes levied in cer-

tain districts of the State. Bonds so issued would constitute a "debt or obligation" of the State in the constitutional sense to the same extent as if they were to be repaid by property taxes levied on a statwide basis.

Respondents contend, however, that the tax to be imposed under this Act was not a general tax but a special assessment and, therefore, does not constitute a property tax within the meaning of Article 10, Section 11. The funds made available to the districts under the present program are used to establish sewer facilities and the Act recites that any tax imposed is "for the benefit and health and welfare of such local units." It is argued that these facts constitute the tax involved here a special assessment, citing our holdings in: *Jackson v. Breeland,* 103 S. C. 184, 88 S. E. 128; *Evans v. Beattie,* 137 S. C. 496, 135 S. E. 538; *Rutledge v. Greater Greenville Sewer District,* 139 S. C. 188, 137 S. E. 597; *Sanders v. Greater Greenville Sewer District,* 211 S. C. 141, 44 S. E. (2d) 185; *Mills Mill v. Hawkins,* 232 S. C. 515, 103 S. E. (2d) 14; *Distin v. Bolding,* 240 S. C. 545, 126 S. E. (2d) 649, and *Newton v. Hanlon,* 248 S. C. 251, 149 S. E. (2d) 606.

The foregoing cases involved the imposition of taxes to repay bonds issued to establish various types of improvements. The conclusions in those decisions that the contributions required were special assessments were based upon findings that special benefits accrued to the property being taxed.

The general distinction between a tax and a special assessment was stated in *Jackson v. Breeland, supra,* 103 S. C. 184, 88 S. E. 128:

"It is very true that in popular parlance, and even in legislative enactments, assessments are frequently called taxes, but courts will look behind mere words to find the real meaning. Taxes, in the strict sense of the word, are imposed upon all property, both real and personal, for the maintenance of the government, or some division thereof, while assess-

ments are laid only on the property to be benefited by the proposed improvements. This is the vital distinction running through all the cases."

And in *Evans v. Beattie, supra,* 137 S. C. 496, 135 S. E. 538, the Court stated that "special assessments or special taxes proceed upon the theory that when a local improvement enhances the value of neighboring property that property should pay for the improvement."

The Act authorizes the imposition of an ad valorem tax upon all taxable property within the local unit for the repayment of the grant, which is, in turn, applied to the payment of the bonds. We think that the contribution so required is a tax, and not a special assessment as contended by respondent.

While the Act states that any tax imposed will be for the health and welfare of the local units involved, such statement fails to show the real nature and purpose of the program to be financed. In Section 1 of the Act, the General Assembly finds that "efforts have been and are being made at local levels to provide for the treatment of sewage and other effluent in order that the streams, rivers, and water-courses of the State may be freed from pollution and in that way hazards to health now existing be reduced or eliminated," and that "to date South Carolina has no program for State financial participation in the attempt to eliminate or mitigate pollution." The declared intent of the Act is to eliminate or mitigate water pollution in the Sate of South Carolina through "the construction of sewer mains and waste treatment facilities with which to collect, treat and dispose of sewage and other effluent."

The funds derived from the sale of the bonds are to be used for the establishment of facilities to purify the watercourses of the State. Such a program benefits all areas of the State and particularly those sections through which the streams flow. There is nothing to show that water pollution control, as set forth in the Act, is such a local improvement

as will confer any special benefit on the property owners in the local units, so as to justify regarding the ad valorem tax as an assessment for a benefit conferred. *Berry v. Milliken,* 234 S. C. 518, 109 S. E. (2d) 354.

We, therefore hold the Act in question unconstitutional for the reasons stated and, accordingly, reverse the judgment of the lower court.