Virginia Marrow SMITH et al., Plaintiffs,

v.

Roderick D. MOORE, Administrator d.b.n., c.t.a., and Trustee of the Estates of George B. West and Missouri P. Smith, deceased, et al., Defendants.

Civ. A. No. 714.

United States District Court
E. D. Virginia,
Newport News Division.
Dec. 23, 1963.

Ford & Avis, Newport News, Va., Townsend & Townsend, Columbia, S. C., Lipshutz, Macey, Zusmann & Sikes, Atlanta, Ga., Neill H. Alford, Jr., Charlottesville, Va., for plaintiffs.

S. W. Colonna, Henry D. Garnett, Newport News, Va., for administrator and trustee of Estates of West and Smith.

Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., for University of Richmond and Virginia Tabb Moore.

WALTER E. HOFFMAN, Chief Judge.

The ultimate issue in this case is whether certain trusts, created by the last will and testaments of George B. West and Missouri P. Smith, have failed because of insufficient funds to accomplish the specific purposes set forth by the testator and testatrix in their respective wills. The plaintiffs are the sole surviving descendants and heirs-at-law of said testator and testatrix. By successive appointments the defendant, Moore, is the sole personal representative and trustee of the estates and trusts created by said wills. As the trust created by the will of Missouri P. Smith incorporates by reference the trust established by the will of George B. West, they will, with minor exceptions as hereinafter noted, be referred to as one trust.

On May 28, 1910, George B. West executed his last will and testament in holographic form. In like manner he executed a codicil to his last will and testament dated January 27, 1912. He died on March 3, 1917, and on March 6, 1917, the will and codicil thereto were admitted to probate in the Corporation Court of the City of Newport News, Virginia, in which city he had resided during his entire life.

George B. West and Missouri P. Smith were brother and sister. West never married. Emily M. Barrett was the daughter of Missouri P. Smith and the niece of George B. West. The typewritten last will and testament of Missouri P. Smith was executed on June 5, 1920, and following her death in 1926, was probated in the aforesaid court on June 15, 1926.

The will of George B. West, after providing for the payment of his debts and a bequest of his household goods and effects to his niece, Emily M. Barrett, devises and bequeaths to his executors the entire residue of his real and personal estate "to be held by them for the following uses and purposes and none other"—

(1) To invest and reinvest the property according to their discretion, with the income to be used and paid out as follows:

(a) A monthly sum of $50.00 to Bettie Bell Vest, a niece, for her life.[1]

(b) A monthly sum of $50.00 to the household of William Drumond Marrow, a nephew, for his life, with

---

[1]. Bettie Bell Vest died in 1934. Her will was probated in the same court on December 12, 1934.

a further specific bequest for any of said nephew's child or children, or the issue of such child or children if the parent be dead.

(c) The income from the estate and investments remaining to be paid to his niece, Emily M. Barrett, for her life.

(2) The use and benefit of a certain lot of land in Newport News was given to the niece, Emily M. Barrett, for her life, with taxes to be paid by the estate.

(3) Thereafter follows the language of the will which gives rise to the present litigation. The testator provided:

"As soon after her [Emily M. Barrett's] death as practicable, they [executors] are to pay over all of my personal estate and convey all real estate belonging to my estate to the Board of Directors of a Hospital hereinafter named and described and directed to be organized and incorporated, or to such persons as they may direct, to be held for the use and benefit of said Hospital, as hereinafter provided."

After granting authority to sell real estate without requiring the purchasers to see to the application of the purchase money, George B. West wrote the sixth and seventh clauses of his will giving detailed instructions for the establishment of the aforesaid hospital in the following manner:

"*Sixth.*—My executors hereinafter named or the acting or surviving one of them, or my personal representative shall after the death of my niece Emily M. Barrett select and associate with them or him as many other men as will make nine men including such executors, executor or personal representative or representatives, who to-gether (sic) shall incorporate organize and establish a free Hospital in the City of Newport News, Va., or within five miles of its then corporate limits to be after the pattern of the Sheltering Arms Hospital of Richmond, Va., and of which the said nine men shall be the officers and directors for the first year with power in them and their successors to fill vacancies as they may occur. The Hospital shall be named 'The Parker and Mary West Hospital', after my parents. It shall be non-sectarian, and entirely free from charges and pay by or from its patients and said hospital to minister to all worthy white persons from the city of Newport News, Va. and Eastern Virginia, who are not able to pay physicians and hospital charges, and are not incurable and have no contagious diseases. Preference being given to patients of Newport News, Va.

"*Seventh.*—My said executors, executor or personal representative or representatives shall at the death of my said niece Emily M. Barrett or as soon thereafter as they may deem practicable, turn over, transfer and assign to such officers of said hospital, all of my personal and real estate then in their hands or under their control (except that part of my estate specifically bequeathed) to be used for the establishment and maintenance of said free hospital. I desire and direct that not more than one-fifth ($\frac{1}{5}$) of my estate shall be used in the purchase of a site for said hospital and in erecting buildings and furnishing and equiping (sic) the same. I desire and direct that the income derived from the balance of my estate shall be used and applied to the maintenance of said hospital. The principal thereof to be left intact as an Endowment Fund of said Hospital. The receipts and income therefrom to be used for maintenance and current expenses of said hospital. The Board of Directors, and Board of Managers shall serve without pay."

The foregoing provisions essentially set forth the pertinent clauses of the will of George B. West. The codicil, executed approximately two years thereafter, cancelled certain notes owing to him by his nephew, W. D. Marrow, and

the latter's wife and, in addition, made three bequests of $500.00 each to the Home Mission Board, the Foreign Mission Board, and the State Mission Board, all of which were associated with the Baptist Church.

The last will and testament of West's sister, Missouri P. Smith, so far as it may be deemed pertinent, bequeathed her household goods and effects to her daughter, Emily M. Barrett, for and during her natural life, with the "remainder at her death to the Hospital hereinafter named and provided for." Then, after making suitable provisions for taxes and estate expense and monthly bequests during the college days of two nieces, the testatrix directed that the remaining income be paid to her daughter, Emily M. Barrett, during her life with the following precatory provision:

"I make this provision for my daughter not because I think she needs or will ever need it, but because of my confidence in her good judgment and her disposition to carry forward the objects in which I am interested— So I would suggest and request that, as to any unexpended income from my estate, she will give same at her death to the Hospital sought to be established by my brother and myself as a family memorial."

The will of Missouri P. Smith continues:

"At the death of my said daughter [Emily M. Barrett] said executors and trustees shall turn over the entire remainder of my estate, of every sort and description, to the 'Parker & Mary West Hospital', to be incorporated as provided in clause six (6) of the will of my brother, Geo. B. West, which is on record in the Clerk's Office at Newport News."

Thus, as late as 1920 when Missouri P. Smith executed her will, the process of inflation had not become so apparent to this testatrix. She obviously believed that her brother's wishes could be carried out as directed by his will.

The beneficiary of the life estates created by the West and Smith wills was,

as noted, Emily M. Barrett. By her will dated September 2, 1944, Emily M. Barrett makes specific reference to a portion of the will of her uncle, George B. West, and then states:

"The establishment of such a free hospital in Newport News or within five miles of the corporate limits, after the pattern of the Sheltering Arms Hospital, of Richmond, Virginia, same to be known as the 'Parker and Mary West Hospital', was a project very dear to the heart of my uncle, said George B. West, as is evidenced by his will, and he expressed to me the desire that I should assist in accomplishing this benevolent purpose. I give, devise and bequeath unto the person or persons who shall then be the administrators of the estate of my late uncle, George B. West, the sum of Twenty-Five Thousand Dollars ($25,000.00) to be paid to them by my executors as soon after my death as it practicable in the judgment of my executors, which said sum shall thereupon become a part of the estate of my said uncle, the late George B. West, to be administered as a charity in accordance with the provisions of his will."

By a codicil dated August 10, 1951, Emily M. Barrett revoked the foregoing bequest of $25,000.00 by saying:

"Conditions having changed since the execution of my will of September 2, 1944, I hereby revoke and annul the bequest of $25,000 set forth in paragraph 4 of Article SECOND of my said will, and all of the provisions of said paragraph 4 of Article SECOND are hereby revoked and annulled."

Manifestly, Emily M. Barrett was then fully cognizant of the many problems confronting those charged with the duty of carrying out the wishes expressed by George B. West and Missouri P. Smith with respect to the establishment and maintenance of a free hospital for indigent white persons in the Eastern Virginia area.

Emily M. Barrett died in 1953 and her will and codicil were probated in the Clerk's Office of the Corporation Court of the City of Newport News on September 4, 1953.

The surviving heirs-at-law (the plaintiffs herein) are two great-grand-nephews and a great-niece. Their relationship to George B. West and Missouri P. Smith has been fully proven. As the West and Smith wills made no provision for the disposition of the trusts created by said wills in the event the specific purposes failed, the plaintiffs would be entitled to the balance remaining in said estates and trusts as the sole heirs-at-law if there has been a failure of purpose, unless the *cy pres* doctrine is recognized by statute or under judicial *cy pres* power.

The combined estates have available for trust purposes a sum approximating $700,000.00. Plaintiffs argue that this sum is entirely inadequate to carry out the terms of the trust created by George B. West and adopted by Missouri P. Smith and, therefore, the trust has failed. Defendant contends (1) the trust is not impossible of performance and the fund is not inadequate, and (2) even if the fund is inadequate, the trust may be administered by either legislative or judicial *cy pres*. The issues presented are complex in law and fact.

We start with the premise that if George B. West or Missouri P. Smith were alive today, they probably would not direct that their estates be delivered to distant relatives in the event of the failure of the specific purpose set forth in said wills. This is not, however, the sole test to apply.

■ Equally clear is the fact that, without the application of legislative or judicial *cy pres*, the precise wishes of George B. West are incapable of performance with the funds available. To suggest that not more than one-fifth of $700,000.00 be used for site acquisition, constructing a hospital and equipping same, under prices prevailing at any time since the death of Emily M. Barrett, would be little short of ridiculous. Defendant argues that such a hospital could perhaps be organized for the benefit of ten patients. While we agree that the words of the testator "after the pattern of the Sheltering Arms Hospital" are not *per se* binding upon the defendant as to bed capacity, size, equipment, facilities, etc., we cannot be blind to the fact that ten bed hospitals are not maintainable.

At this point it is perhaps well to review the history of Sheltering Arms Hospital which, incidentally, is still in operation in Richmond, Virginia. This institution demonstrates a pattern of sacrifice and hard work, modesty and faith, all with little or nothing at the beginning, but eventually giving rise to a growth of considerable importance to the City of Richmond and its needy sick. It was established in 1889. With six patients and one nurse, it was initially housed in part of a hotel in downtown Richmond. With the assistance of gifts and solicited funds, the hospital progressed. In 1892 a residence was purchased and remodeled, opening in 1894 with 17 beds. In 1901 a group of leading citizens established an endowment fund through contributions sufficient to provide $16,000.00 annual income. An annex was constructed in 1909–1910, thus increasing to 41 the bed capacity. This was the situation existing when George B. West prepared and executed his will. Services of physicians were entirely voluntary at Sheltering Arms. There was a nursing school on the premises and, in 1909–1910, there were two graduates. The physical plant of the hospital was extremely modest. Surgical, medical, obstetrical, orthopedic and pediatric services were available but it had no X-ray facilities. The staff made its own supplies, bandages, etc., but numerically the staff was always small and, as late as 1922, there were only 10 nurses in training, 2 graduate nurses, an interne, and approximately 12 additional persons supplying general services such as cooking, janitorial, orderly, etc.

We accept as a fact that the minimum basic cost of constructing a 40 bed hos-

pital would be approximately $560,000.00 without equipment or site acquisition costs.[2] Such an expenditure would absorb the entire trust and leave nothing for the operation of the hospital and the care of patients as provided in the will.

Even the defendant concedes that the funds are "inadequate to establish a hospital in accordance with the wishes of the testator and testatrix." In 1955, he filed an *ex parte* petition in the state court setting forth these facts and requesting more time within which to devise a plan as to what should be done with the trust funds. The order entered by the state court on defendant's *ex parte* petition refers to the inadequacy of funds in granting the fiduciary additional time. At the trial defendant admitted that he knew the kind of hospital George B. West made reference to in his will, and that the defendant could not build, operate and maintain such a hospital because of inadequacy of funds.

Defendant advances two solutions to the problem. Riverside Hospital, an established institution in the City of Newport News, is now in the process of constructing a new hospital to serve the community. Even prior to the death of Emily M. Barrett certain efforts were made to endeavor to secure the trust funds to take effect after the termination of the life estate. It is now suggested, perhaps belatedly, that a clinic, which is to be an integral part of the new hospital, will be named the "Parker and Mary West Clinic." The so-called Riverside plan has certain commendable features if it were possible for this court to redraft the wills of the testator and testatrix. However meritorious the plan may be—and irrespective of personal wishes—the plan does not come within the framework of the expressed intentions and directions of the trust, and cannot be carried into effect unless legislative or judicial *cy pres* is invoked.

The second alternative—not to any extent formalized—is that the north wing of the existing Riverside Hospital could be acquired for $150,000.00, including the equipment.[3] This wing accommodates 47 patients and, with some modification and provision for administrative offices in lieu of first floor bedrooms, could be used for hospital purposes. The principal difficulty with this suggestion is that the cost of operation would exceed any possible income from the remaining assets of the trust, plus what could reasonably be anticipated by way of contributions from the generous citizens of the community. Agreeing with the defendant that the West and Smith wills do not foreclose the solicitation and acceptance of funds from outside sources, the defendant does not contend that any predictable income from all sources will permit the operation of a hospital in excess of 10 bed capacity. The views of the court on this type of operation have heretofore been expressed. We do not say, however, that if the *cy pres* doctrine is applicable, it would prevent the use of the trust funds for either of the alternatives proposed. Nor do we suggest that Sheltering Arms Hospital in Richmond should be overlooked if *cy pres* is applicable as the place factor would not then be of prime importance.

Having intimated the views of the court with respect to the alternative plans, we see no necessity to discuss plaintiffs' argument that the evidence of alternative plans should not have been received. Plaintiffs concede in their able brief that such evidence may be considered if—

(1) A general charitable intent, as contrasted with a specific charitable intent, was expressed in the wills, *and*

(2) If § 55–31 of the Code of Virginia may be applied retroactively as well as prospectively, *or*

(3) If the *cy pres* doctrine existed in Virginia without benefit of statute.

---

2. A more realistic cost of a 40 bed hospital patterned after Sheltering Arms Hospital would be in excess of $900,000.00, exclusive of land acquisition costs.

3. Since this case was submitted, and prior to decision, the north wing of the existing Riverside Hospital has been sold to other interests.

To these important questions the court will now direct its attention.

### General Charitable Intent

Before invoking the *cy pres* doctrine, whether by statute or through the medium known as judicial power, it is necessary that there be (1) a valid charitable trust without a gift over, (2) an existing general charitable intent, *and* (3) the beneficiaries must be indefinite or uncertain, *or* (4) the purpose of the trust must be indefinite, impossible to perform, or so impracticable of performance as to characterize the fulfillment of the purpose as "impossible."

Conceding that there may be room for argument under Thomas v. Bryant, 185 Va. 845, 40 S.E.2d 487, 169 A.L.R. 257, that, by analogy, a hospital may be erected and maintained for a limited group of indigent white persons in like manner as the Supreme Court of Appeals of Virginia concluded could be done with respect to the maintenance of a home for aged white people, we, nevertheless, are confronted with the obvious distinction between the operation of a hospital and a home for aged persons. We conclude, therefore, that Thomas v. Bryant is inapplicable, except to the extent that it may disclose evidence of general charitable intent and the importance it played in the enactment of § 55–31 of the Code of Virginia during the year 1946.

At all times we must remember that we are seeking the *dominant* intent of the testator, since the specific purposes are incapable of fulfillment. It is true that George B. West, in establishing the charitable trust through the residuary clause of his will, devised and bequeathed his estate to his executors "to be held by them for the following uses and purposes and *none other*." Plaintiffs urge that the use of the words "none other" forecloses any consideration of general charitable intent. We disagree. In the Restatement of the Law, Trusts (2d), § 399c, we find this comment:

> "The mere fact, however, that it is provided by the terms of the trust that the property shall be devoted 'forever' to a particular purpose, or that it shall be devoted to that purpose 'and no other purpose', or that the property is given 'upon condition' that it be applied to that purpose, does not necessarily indicate the absence of a more general charitable intention of the settlor; it may merely emphasize the intention of the settlor that the property should not be applied to other purposes as long as it is possible and practicable and legal to apply it to the specified purpose, and does not necessarily indicate an intention that the trust should terminate if it should become impossible or impracticable or illegal to carry out the particular purpose."

In Thomas v. Bryant, supra, the testator, in much the same manner as George B. West, specified the location and name of the proposed Home for the Aged. He further endeavored to designate the proportion of the trust to be used for the acquisition or erection of a building, with the remainder of the trust to be invested in Government bonds and the income to be used in maintaining and operating the home as well as supporting the inmates and providing reasonable and necessary medical and hospital attention. Discretion as to the kind, size and plan of the home was vested in the trustees, together with the rules and regulations for admission, operation and management. True, the testator included a phrase in his will—not specifically stated by George B. West—which furnishes abundant evidence of his general charitable intent when he said:

> "It is my sincere wish and desire that the home for the aged, hereinbefore referred to, be perpetual in its operation, and that it will render a noble service in the purpose for which it was created."

It is well settled in Virginia that charitable gifts are viewed with peculiar favor by the courts and every presumption consistent with the language contained in the instruments of gift will be employed in order to sustain them. All

doubts will be resolved in their favor. Thomas v. Bryant, 185 Va. 845, 852, 40 S.E.2d 487, 169 A.L.R. 257; Shenandoah Valley Nat'l. Bk. of Winchester v. Taylor, 192 Va. 135, 63 S.E.2d 786, 25 A.L.R. 2d 1104; Owens v. Bank of Glade Springs, 195 Va. 1138, 81 S.E.2d 565.

■■ It is equally well settled that where a testator uses a general residuary clause in his will, the courts are inclined against adopting any construction which leaves him intestate, unless that result is inescapable. The law does not favor intestacy. Owens v. Bank of Glade Springs, supra; Arnold v. Groobey, 195 Va. 214, 224, 77 S.E.2d 382.

■ The background of the testator, his interest and spirit in community projects, his education and business acumen, may all be considered in determining his general charitable intent, unless the same is foreclosed by the precise language of the will. Owens v. Bank of Glade Springs, supra.

Even more significant is the comment from the Restatement of the Law, Trusts (2d), § 399i, p. 302, where we note:

"If property is given in trust to be applied to a particular charitable purpose, and at the time when the property is given it is possible and practicable and legal to carry out the particular purpose, but subsequently owing to a change of circumstances it becomes impossible or impracticable or illegal to carry out the particular purpose, it is easier to find a more general charitable intention of the settlor than it is where the particular purpose fails at the outset. The court can fairly infer an expectation on the part of the settlor that in course of time circumstances might so change that the particular purpose could no longer be carried out, and that in such a case the settlor would prefer a modification of his scheme rather than that the charitable trust should fail and the property be distributed among his heirs who might be very numerous and only remotely related to him. The courts are therefore more ready to apply the doctrine of cy pres where the particular purpose fails at some time after the creation of the trust than that they are where the particular purpose fails at the outset.

"As a matter of public policy it might well be held that in the case of a subsequent failure of the particular purpose the doctrine of cy pres should always be applied and that the property should never revert to the settlor or his estate. The longer the period between the creation of the charitable trust and the failure of the particular purpose, the more undesirable it is that the property should revert to the settlor's estate."

Specifically dealing with the failure of a particular charitable purpose where the amount is insufficient—as in the present case—the Restatement of the Law, Trusts (2d), § 399j, pp. 302, 303, contains this statement:

"If property is given in trust for a particular charitable purpose and the amount given is so small that it is impossible to accomplish the purpose with the amount so given, the intended trust fails if, but only if, the settlor manifested an intention to restrict his gift to the particular purpose which he specified. Thus, if a testator bequeaths the residue of his estate in trust to erect a hospital and the amount of the residue proves to be insufficient for the purpose, the court will direct the application of the fund to the endowment of a ward in an existing hospital, or otherwise for the promotion of health, unless the will as interpreted in the light of all the circumstances indicates that the testator intended to restrict his gift to the establishment of a hospital and had no general intention to aid the sick."

■ With this background we examine the will of George B. West, executed in 1910 and probated in 1917, containing

a life estate in favor of his niece, Emily M. Barrett. He obviously provided for such of his relatives as he desired in selecting two nieces and a nephew as the recipients of certain amounts of income for their lives. While undoubtedly one of the motives prompting him to create a charitable trust was to perpetuate the memory of his father and mother, his motive becomes immaterial if the dominant purpose of the trust was, in fact, charitable. Virginia, having obviously looked upon charitable trusts with peculiar favor, would, if called upon to do so, approve the language in Ramsey v. City of Brookfield, (Mo.1951) 237 S.W. 2d 143, which cites Bogert on Trusts, Vol. 2, § 436, p. 1307, Scott on Trusts, Vol. 3, § 399, Am.Jur., Charities, Vol. 10, § 127, p. 678, and states:

> "A 'general charitable intent' is not limited to intent to do 'charity in general'. * * * A general charitable intent exists in any case where there is an intent to assist a certain general type or kind of charity. If such intent exists, any means specified by the settlor is deemed his preference for dispensing the general kind of charity he has chosen to aid. And a general charitable intent is negative only where it is determined that the settlor's intent was to aid that kind of charity only in a particular way or by a particular method or means, that he intended to make no gift to that general kind of charity other than by specified particular means, that he intended that, if specified particular means failed, the gift failed, and the corpus of the trust could no longer be used for the general type or charity he desired to assist."

In Brookfield, the parties agreed that the hospital could not be built, equipped and maintained with the limited funds available and, despite the fact that the testatrix provided that her bequest was to be used for this "sole purpose" and "no other", that court held, in applying the cy pres doctrine, "The insufficiency of the fund provided is no good reason for defeating a charitable gift or trust if the intention of the donor can to some extent be carried into effect" and, since the general charitable intent appeared, the method selected by the testatrix was subordinated to the general purpose.

We think that the specific method adopted by George B. West in establishing the hospital must give way to his general charitable intent. While it is true that much of the language of the will contains these specificities, the dominant purpose was to provide free hospitalization for indigent sick of the white race from Eastern Virginia, with preference being given to patients from Newport News.

Plaintiffs argue that to apply the doctrine of cy pres would involve a clear violation of the testators' intent in that they sought to aid "all worthy white persons." Admittedly Riverside Hospital, and all other like institutions in the present day, admit non-white persons. While it is true that, by applying cy pres, non-whites could not be refused admission in a hospital such as Riverside, a recipient of Hill-Burton funds, Simkins v. Moses H. Cone, Memorial Hospital, 4 Cir., 323 F.2d 959 (decided November 1, 1963), such portion of the fund reserved for endowment purposes could still be used solely for white persons. Moreover, we understand that Sheltering Arms Hospital has confined its patient list to those of the white race, although this court is not advised whether Sheltering Arms has received Hill-Burton funds. We do not think that LaFond v. City of Detroit, 357 Mich. 362, 98 N.W. 2d 530, is controlling. In that case the testator left the balance of his estate to the City of Detroit "for a playfield for white children, and known as Sagendorph Field." It was conceded that the maintenance of a playground for white children only was unlawful in Michigan. Detroit's governing body agreed to accept the bequest if the court would construe the will as giving the city the right to make the playground available to all children without regard to race, color or creed. By an evenly divided

court the Supreme Court of Michigan held that the bequest was invalid, that *cy pres* could not be invoked to validate an unlawful bequest, and that no general charitable intent had been shown. We do not construe the West and Smith wills as requiring, as in LaFond, that the will be "carried out to the letter." Nor do we believe that West intended to provide a hospital for white persons *only* or, in the alternative, *no hospital at all.* The provision for ministering "to all worthy white persons" is an expression of secondary intent which must yield to the dominant general charitable intent.

We are mindful of the fact that the establishment of a memorial in honor of the testators' father and mother was uppermost in the minds of West and Smith. Under the application of *cy pres* such a memorial may be established even though it does not comply with the literal wording of the will. Manifestly it was the testators' desire to perpetuate the names of their parents with some form of charity ministering to the needy. While the amount involved is clearly not sufficient to construct, operate and maintain a hospital under the terms specified by the West will, it is certainly adequate to entice institutions eligible to receive the trust estates under *cy pres* to arrange for perpetuating the memory of Parker and Mary West.

In Jones' Unknown Heirs v. Dorchester, (Tex.Civ.App.) 224 S.W. 596—a case cited with approval by the Supreme Court of Appeals of Virginia in Thomas v. Bryant, supra—it is said (224 S.W. 604):

> "Appellants contend that in directing that the hospital should be known as the 'Wilson N. Jones Hospital' there was manifested on the part of the grantor 'a desire to perpetuate his name and thereby connect himself with posterity,' and that this clause of the will had its origin in what Justice Moore, in the case of Paschal v. Acklin, 27 Tex. 198, describes as the desire to perpetuate his memory. While this may be true, and while a hospital costing

less than $100,000 would not be as imposing a monument to his memory as one costing three times that sum, the court would not be warranted for that reason to declare that the trust had failed because the intent of the testator could not literally be carried into effect. It would still be the duty of the court to give effect to the desire of the testator specifically declared insofar as the funds left in the hands of the trustees would permit, and this the courts have almost universally done under the cy pres doctrine. One feature of the cy pres powers of courts in relation to devises and trusts, or as it is sometimes exercised by courts of equity in the United States, under the doctrine of approximation, is the power by liberal rules of construction and interpretation to enforce a trust for a designated and specific purpose, though created in general terms, and enforce it within the limits of such purpose expressed in the instrument."

■ The absence of a provision for forfeiture in case of noncompliance with a direction in a will with regard to a charitable trust is an indication that the testator did not intend that the gift should revert on failure to comply therewith while the carrying out of his general purpose is practicable. Am.Jur., Charities, Vol. 10, § 129, p. 681. Neither the will of George B. West nor of Missouri P. Smith contained any reverter or forfeiture clause.

Concluding, as we must, that George B. West and Missouri P. Smith had a general charitable intent as expressed in their wills, aided to some extent by the character of George B. West—but primarily based upon the language of the will—we pass to a discussion of the *cy pres* doctrine.

*The 1946 Statute*
*Section 55–31 of the Code of Virginia*

During the year 1946, while Thomas v. Bryant was then pending but undecided before the Supreme Court of Ap-

peals of Virginia,[4] the General Assembly enacted what is now commonly called the *cy pres* statute. Acts 1946, Ch. 187, p. 294. At that time the preamble set forth the following:

"Chap. 187.—An Act to amend the Code of Virginia by adding two new sections No. 587–a and 587–b, relating to certain charitable trusts, their validity and administration; and providing for the recordation of instruments creating or affecting such trusts, and their incorporation by reference in certain other instruments."

What was then § 587–a is now § 55–31 of the Code of Virginia, 1950. It has not been amended since its enactment and, for convenient reference, is set forth in the margin.[5]

Thus the question presented is whether wills establishing charitable trusts and probated during the years 1917 and 1926 respectively are affected by § 55–31 of the Code of Virginia, adopted by the General Assembly of Virginia in 1946 while Emily M. Barrett was enjoying a life estate as to all of the income from said trusts so created.

We feel that an intelligent interpretation of § 55–31 leads to the belief that this statute should be applied to the West and Smith trusts, and is not unconstitutional. The statute was a general statute, not aimed at the West and Smith trusts, but undoubtedly prompted by a possible ruling by the Supreme Court of Appeals of Virginia in Thomas v. Bryant to the effect that the *cy pres* doctrine would not be held applicable in Virginia. To protect the litigants in Thomas v. Bryant the exclusionary provision relating to "pending litigation" was inserted. Had the General Assembly intended to prohibit the application of § 55–31 to any trust then in the course of administration, it could readily have provided that the legislation would not apply to or affect any trust or fund which was evidenced by a document previously probated.

There is no evidence in this record as to the status of the trusts in 1946 and the possibility of literal compliance with the testators' wishes as expressed in the probated instruments. Indeed, plaintiffs do not allege a failure of purpose prior to the death of Emily M. Barrett in 1953. We do not know whether the specific purposes of the trusts had failed in 1946. Section 55–31 did not bring to life a trust that had failed or been declared invalid.

Nor do we agree with the plaintiffs that any vested interests ex-

4. In Shenandoah Valley Nat'l Bk. of Winchester v. Taylor, 192 Va. 135, 63 S.E. 2d 786, Justice Miller noted that § 55–31 was "enacted shortly before the decision in Thomas v. Bryant, supra, but that was a suit instituted in 1943, and by an express provision of the Act, it excluded from its application any trust or fund which was the subject of pending litigation."

5. "§ 55–31. Indefiniteness not to defeat certain trusts.
"When any corporation, firm, association, partnership or person gives, bequeaths, grants, conveys or devises any real or personal property in trust to or for any educational, charitable or eleemosynary purpose, the indefiniteness or uncertainty of the beneficiaries named in any instrument creating such a gift, bequest, grant, conveyance or devise, or the indefiniteness of the purpose of the trust itself, shall not defeat any such trust and, if the trust is in other respects valid under the laws of this State, it shall be administered to conform as near as may be to the purpose for which created or, if impossible of performance for this purpose, for some other educational, charitable, benevolent or eleemosynary purpose. However, unless the maker of the trust has specifically designated some other body, committee, agency or entity to determine what that purpose shall be and to administer the trust (in which event the determination and administration by that body shall be valid), the determination of the purpose of the trust shall be made by a court of equity in the county or city wherein the property or the greater part thereof is located and the administration of the trust shall be under the direction of such court.
"The provisions of this section shall not apply to or affect any trust or fund which is the subject of pending litigation."

listed in 1946 which the statute may have violated. As was said in Trustees of New Castle Common v. Gordy, 33 Del.Ch. 334, 93 A.2d 509, 40 A.L.R.2d 544, "Legislation respecting a charitable trust is valid if in aid of its purpose and not in destruction or impairment of the interests arising under it." The present plaintiffs, of course, have no interest in the purposes set forth under the charitable trusts here created. Their interest is to defeat the purposes. While it is true that the legislature cannot terminate a charitable trust, nor change its administration on the ground of expediency, nor seek to control its disposition under the doctrine of *cy pres*, this does not suggest that the legislature cannot properly reserve to the judicial branch of government the power to do these acts.

In Trustees of Sailors' Snug Harbor in City of New York v. Carmody, 211 N. Y. 286, 105 N.E. 543, one Robert Richard Randall died on January 5, 1801, and his will was admitted to probate on July 10, 1801. His residuary clause provided for the erection of an asylum or marine hospital for the purpose of maintaining and supporting aged, decrepit and worn-out sailors. The institution was to be perpetual. Thirty years later the asylum and marine hospital was opened. No power to sell real estate was granted. In 1893 and 1901 New York enacted certain statutes relative to charitable trusts —the 1901 statute being similar to § 55–31 of the Code of Virginia. The New York court said:

> "The complaint in this action contains allegations tending to show that the devisee of the trust cannot literally comply with the terms of the will of Mr. Randall, and under the statute above referred to the Supreme Court is authorized to make a decree directing the trustees in the administration of the trust and in such manner as will more effectively accomplish the intention of the testator."

History teaches us that, with respect to the postponement of the operative effect of a charitable trust, a statute enacted subsequent to the probate of a will may be applicable in Virginia. Such is the doctrine enunciated in the ancient case of Charles v. Hunnicutt, 5 Call (9 Va.) 311. One Hunnicutt executed his will on April 13, 1781, which, following his death on the same day, was probated in October, 1781. The will provided as follows:

> "My will and desire is, that the following negroes should be manumitted on or before the first month next 1782, viz. Tom, Joe, Charles, Ben, Jenny and her child Charlotte. I give the above named negroes to the monthly meeting, of which I am a member, to be manumitted by such members of said meeting, as the meeting shall appoint."

At the time of the testator's death and the probate of his will, the Act of 1748, Ch. 31, was in effect and Virginia's highest court was governed by its prior decision in Pleasants v. Pleasants, 2 Call 319, 351, which provided that although the testators, at the time of making their respective wills, had no power to manumit and if the will provided that the devisees should emancipate the slaves immediately then the bequest would be void as contrary to law, but if the condition was that the slaves would become free when the law would permit same then the estate in the slaves was subject to be defeated by a contingency only. The monthly meeting of Quakers, of which the testator was a member, was held in December, 1781, and two members were appointed to prepare and execute the instrument of manumission. In May, 1782, after the time limit fixed by the testator, the Assembly passed an act authorizing the manumission of slaves. In upholding the will and the deed of manumission executed subsequent to the act authorizing same, the court viewed the devise as one of charity requiring liberal interpretation and, as one judge expressed it, "courts of equity will relieve against the lapse of time, unless the performance within the time were an essen-

tial part of the contract; and was a circumstance without which the contract could not be called into operation."

While Charles v. Hunnicutt, supra, has been on the books for nearly 200 years, it manifestly demonstrates the tendency of Virginia courts in dealing with statutes passed after the probate of the will which, in turn, aid in carrying out the dominant purpose of the testator.

Plaintiffs rely upon Beatty v. Union Trust & Deposit Co., 123 W.Va. 144, 13 S.E.2d 760, wherein the will was probated in 1924 and the testatrix provided as follows:

"I wish to create a permanent fund the accumulated interest of which shall be used from time to time in placing worthy homeless old women in some one of the Protestant Homes maintained for the purpose of affording a permanent home for shelterless old women."

Plainly the will was too vague and indefinite to be valid as a testamentary disposition to persons for private use and, in considering the doctrine of charitable uses, the court pointed out that West Virginia's *cy pres* statute enacted in 1931 was *expressly made non-retroactive.* Moreover, in Beatty, as distinguished from the present controversy, the bequest to charity was to become effective at once and, unlike the factual situation here presented, was not to be postponed until the death of one enjoying a life estate. In short, under the West and Smith wills, the fiduciary could take no action in endeavoring to carry out the wishes of the testators until the death of Emily M. Barrett.

 We have not overlooked the familiar rule that a statute is always to be construed as operating prospectively, unless a contrary intent is manifest. However, it should be noted that a statute is not regarded as operating retroactively because of the mere fact that it relates to antecedent events, or draws upon antecedent facts for its operation, Savings Bank of Baltimore v. Weeks, 110 Md. 78, 72 A. 475, 22 L.R.A.,N.S.,

221, holding that a statute providing for the administration upon the estate of persons who have been absent from their usual places of residence and unheard of for a period of seven years may operate upon estates of persons whose absence began prior to the enactment of the statute; Lewis v. Fidelity & Deposit Co., 292 U.S. 559, 571, 54 S.Ct. 848, 78 L.Ed. 1425. It is well settled that such a statute is not rendered retroactively merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment. Cox v. Hart, 260 U.S. 427, 435, 43 S.Ct. 154, 67 L.Ed. 332; Reynolds v. United States, 292 U.S. 443, 54 S.Ct. 800, 78 L.Ed. 1353. Section 55–31 of the Code of Virginia impaired no vested right and brought into existence no new obligation which, at that time, affected any private interest. The statute in controversy was merely enacted to aid in the supervision and enforcement of charitable trusts in an effort to prevent their failure occasioned by impossibility of specific performance. Moore v. Downham, 166 Va. 77, 184 S.E. 199.

We would be remiss if reference was not made to Moore v. Perkins, 169 Va. 175, 192 S.E. 806, in which the court, by way of *obiter dictum,* said that § 6298–a of the Code of Virginia, 1942, was inapplicable to a will probated in 1933, several years prior to the enactment of this statute which provided for the substitution of trustees in discretionary trusts. The bare statement contained in the last paragraph of the opinion was wholly unnecessary to the decision. Indeed, the pertinent statute in Moore v. Perkins was a validating act but, as indicated by the court, the trust created by the testatrix was wholly invalid and would not have been aided by the statute even if the will had been probated after its enactment.

Section 55–31 does not attempt to validate an otherwise invalid trust. The trusts created by the West and Smith wills were valid charitable trusts created for the dominant purpose of carrying into effect a general charitable intent. In

aid of that intent the disputed § 55–31 became applicable when the fiduciary was called upon, and initially permitted to, carry out the wishes of the scriveners. As hereafter indicated, the state probate court may properly apply § 55–31.

### The Cy Pres Doctrine Without Benefit of Statute

Having concluded that § 55–31 of the Code of Virginia, 1950, may be applied to the West and Smith trusts, it is unnecessary to consider whether the doctrine of *cy pres* could be applied without regard to statutory assistance. Nevertheless, under the assumption that this case will reach a higher court, a few brief comments appear to be in order.

The question as to whether judicial *cy pres* would apply in Virginia, independent of statute, has never been determined by the Supreme Court of Appeals of Virginia.[6] We, of course, are not concerned with the prerogative power, sometimes known as *parens patriae*.

It would serve no useful purpose to review the judicial surgery which has been applied to charitable trusts in Virginia prior to 1914 when a statute was passed validating all charitable trusts, excepting those for the use of unincorporated theological seminaries. The history is fully set forth in 25 Va.Law Rev. 109 and in Fitzgerald v. Doggett's Ex'r., 155 Va. 112, 155 S.E. 129. The conclusion of the author in 25 Va.Law Rev. 109 is that Virginia would *probably* apply *cy pres* in an appropriate case. The only decision found which lends support to this view is from the Supreme Court of Maryland where in Fletcher v. Safe Deposit and Trust Co., 193 Md. 400, 67 A.2d 386, the Maryland court was called upon to meet the precise question in applying Virginia law. One paragraph

of this opinion rendered in 1949 seems sufficient where it is said:

> "Compelled as we are to decide a question of Virginia statutory law on which the Supreme Court of Appeals of Virginia has not yet directly spoken, our conclusion is that the charitable trusts act of 1914, independent of the act of 1934 or the cy pres act of 1946, the trust created by the bequest in the instant case would be valid and enforceable, by application of the judicial cy pres doctrine or perhaps by construction of the will."

Plaintiffs contend that the only issue before the Maryland court was the validity of the trust under Virginia law. We do not agree that the inquiry was so limited. The Maryland court was required to also determine whether the trust was enforceable under Virginia law. The Maryland case stands for the proposition that the general validating act of 1914 established the doctrine of judicial *cy pres* in Virginia.[7]

While it may be argued that the *cy pres* statute of 1946 was entirely unnecessary if the validating act of 1914 gave the courts full power "to supervise and enforce any and all trusts" and, therefore, the enactment of the 1946 statute demonstrates that judicial *cy pres* did not exist in Virginia prior to that date, we believe that the General Assembly of Virginia, by its desire to uphold charitable trusts, enacted § 55–31 to relieve against any possible contrary ruling in the then pending case of Thomas v. Bryant and to plug the loopholes, if any existed.

 Being unwilling to substitute the judgment of this court for that of the Supreme Court of Maryland, it is the conclusion of this court that Virginia would, in any appropriate case pertain-

6. Virginia's highest court has heretofore held that it was unnecessary to decide whether the *cy pres* doctrine in its broader aspects will be applied in a proper case. Thomas v. Bryant, 185 Va. 845, 40 S.E.2d 487, 169 A.L.R. 257; Shenandoah Valley Nat'l Bk. of Winchester v. Taylor, 192 Va. 135, 63 S.E.2d 786, 25 A.L.R.2d 1104.

7. This is the interpretation given by Bogert, Trusts, Vol. 2A, § 433, p. 327, note 40.

ing to a trust coming into existence after 1914, apply judicial *cy pres*.

The able briefs submitted by plaintiffs present an excellent argument why judicial *cy pres* was not recognized in Virginia prior to 1946. To prolong the discussion on the subject would serve *no useful purpose. It is admittedly a* matter which is subject to contrary interpretations.

### The Function of the State Court

█ This action is properly before this court by reason of diversity of citizenship and the amount in controversy. Once having determined the validity of the trusts and the application of *cy pres*, it is the opinion of this court that the state court, on appropriate petition by the fiduciary, should resolve the remaining issue and allocate the trusts under *cy pres*. Such action would permit parties in interest to be heard.

### Costs

The defendant knew, upon the death of Emily M. Barrett in 1953, that literal compliance with the terms of the West will was impracticable. Prior to any determination of the issues presented it would have been necessary for the fiduciary to file an *inter partes* action against the present plaintiffs to fully adjudicate the rights of said parties. In 1955 he obtained a state court order granting him additional time to resolve the questions presented. At that time he knew that the decedents had left distant relatives, at least one of whom had inquired as to the distribution of these trusts. In 1959 a rough draft of a petition was prepared by counsel for the fiduciary, but the same was never filed and no suggestion was ever conveyed to the plaintiffs that such a petition would be filed.

█ The present action was filed by the plaintiffs on March 14, 1960. As such an action, in any event, would have been required, the costs of these proceedings should be assessed against the defendant in his fiduciary capacity. Such assessment of costs shall include the expense of documents used as exhibits, the plaintiffs' proportionate cost of the original transcript and the copy thereof, as well as the customary taxable items of cost. Rule 54(d), Federal Rules of Civil Procedure; Moore's Federal Practice, Vol. 6, § 54.70(3) (4) (5). Costs in the event of appeal will be left to the discretion of the appellate court.

Counsel for defendant will prepare and present an appropriate decree carrying into effect this memorandum, with a resultant dismissal of the complaint but costs to be assessed against the defendant fiduciary.

The possible interests of Virginia Tabb Moore and the University of Richmond have not been discussed because of the conclusions herein reached.