642 S.E.2d 552

## SOUTH CAROLINA DEPARTMENT OF MENTAL HEALTH, Plaintiff/Petitioner,

v.

## Henry Dargan McMASTER, Attorney General of South Carolina, and The State Budget and Control Board, Defendants/Respondents.

No. 26269.

Supreme Court of South Carolina.

Heard Sept. 20, 2006.

Decided Feb. 20, 2007.

Mark W. Binkley, of Columbia, for Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Robert D. Cook, Senior Assistant Attorney General Havird Jones, Jr., all of Columbia, for Respondent Henry Dargan McMaster, and Edwin E. Evans, Esquire, David K. Avant, and M. Richbourg Roberson, all of Columbia, for Respondent State Budget and Control Board.

Robert W. Hayes, Jr., of Columbia, for Amicus Curiae, National Alliance on Mental Illness.

PER CURIAM.

We accepted this matter in our original jurisdiction to issue a declaratory judgment as to whether or not certain property owned by the Department of Mental Health (DMH), referred to as the "Bull Street Property," is held in a charitable trust and, if so, whether and under what conditions it may be sold.

We hold the property is subject to a charitable trust but may be sold in accordance with our discussion below.

## FACTS

The State Lunatic Asylum was created in 1821.[1]  The Act creating the Asylum implemented a board of seven trustees to be elected by the Legislature, "who shall superintend the public institutions hereby intended to be established."  1821 Acts No. 2269. The following year, the General Assembly passed Act. No. 2286 of 1822 entitled, "An Act to vest the title of the lot upon which the lunatic asylum stands, in the trustees and visitors of said asylum."

"Bull Street," as it has become known, is made up of 185.6 acres, excepting approximately 4.5 acres which contain the Mills Building and surrounding grounds.  The Mills Building was the initial site of the asylum.  The property was originally 14 separate tracts of land, and was acquired by the DMH and its predecessors in a series of transactions occurring between the 1820's and 1905.  The record contains deeds evidencing 12 of these transactions;  the remaining 2 parcels were acquired prior to the 1860's, and no deeds are available.

Several of the deeds contain restrictive language requiring the property to be used "for the use and purposes of the State Hospital for the Insane."  The initial two parcels, conveying a total of 31.5 acres, were conveyed to "The Regents of the Lunatic Asylum of South Carolina, its successors and assigns forever."  The third parcel, comprising 50 acres, was conveyed to "The Regents of the Lunatic Asylum of South Carolina, their successors in office, for their only proper use, benefit, and behoof, forever."  Parcels 6, 7, 8, 9 and 10 all grant property to the Regents of the State Hospital "and their successors and assigns forever for the use and purposes of the said State Hospital."  Each of the parcels was sold to the Board of Regents for a stated consideration, ranging from $5.00 (Parcel 15, .59 acres) to $24,500.00 (Parcel 8, 108.45 acres).  Throughout the years, numerous properties owned by

---

1.  The preamble to the Act recognized, ". . . the benevolent purposes of society require, on the part of the State, a public institution for the reception and cure of lunatics, for the instruction of the deaf and dumb, and for the maintenance of the poor and destitute of either class."

the State Hospital were sold to various entities, the proceeds generally going to the DMH.[2] Most of these sales were authorized by the General Assembly and or the Budget and Control Board.

In 2004, as part of the Appropriations Act, the General Assembly passed Proviso 73.18 to "establish a comprehensive central property and office management facility process to plan for the needs of state government agencies and to achieve maximum efficiency and economy in the use of state owned or state leased real property." Pursuant to the proviso, the Budget and Control Board was directed to identify all state owned properties and title to all such properties, excepting those the Board determined were subject to reverter clauses or other restraints upon transfer of title. The proviso further states that, "[u]pon a determination by the Board that a property should be sold, the agency is required to sell the property and remit the proceeds as directed herein."

In the 2005 Appropriations Act, the General Assembly enacted Proviso 63.40, which was vetoed by the Governor, but overridden by the Legislature. Proviso 63.40 provides, in pertinent part:

Up to 50% of the proceeds, net of selling expenses, from the sale of surplus real properties shall be retained by the Budget and Control Board and used for the deferred maintenance of state-owned buildings. The remaining 50% of the net proceeds shall be returned to the agency that the property is owned by, under the control of, or assigned to and shall be used by that agency for non-recurring purposes.

After inquiries as to whether some of the State Hospital properties could be sold for development, the Attorney General requested the Executive Director of the Budget and Control Board (Board) for his advice and conclusions as to whether there were any prohibitions or limitations on the sale of the Bull Street property, and whether it was encumbered by a charitable trust. The Board responded as follows:

---

**2.** No issue is before this Court concerning prior sales of Bull Street properties. However, we note that our opinion today in no way affects or invalidates any prior sales, to which there has never been an objection.

The current thinking among experts practicing in the mental health field is that large complexes like the Bull Street site which isolate patients and separate them from their communities is not the best situation for the treatment and successful re-integration of patients into the general population. The thinking is that the Bull Street tract is not specifically needed to house mental health facilities and that it would be more efficient and economical for the State and Department of Mental Health to sell this property, relocate facilities, and reinvest the proceeds that would be derived....

The Board noted the property upon which the Mills Building is situated was not included in any plans by the State to sell the property and would remain in State ownership. The Board concluded the property was not encumbered by a charitable trust, such that it believed the General Assembly could authorize a sale of the property. The Board concluded, however, that it would defer to the Attorney General's opinion on the matter.[3]

In response, the Attorney General issued an opinion on December 9, 2005, concluding as follows:

[A] court would most likely conclude that the Department of Mental Health, as successor to the State Lunatic Asylum and South Carolina State Hospital for the Insane, is a "public charity" and that the Bull Street property is thus impressed with a charitable trust. Accordingly, we recommend that prior to any sale, the Department of Mental Health seek court approval of such sale, consistent with the basic principle that a court of equity must approve, by way of equitable deviation, any such transfer.

The Attorney General stated that as an alternative, the Legislature could protect the charitable trust by requiring the proceeds from any sale to be devoted exclusively to the Department of Mental Health.

In light of the Attorney General's opinion, the DMH filed a petition for original jurisdiction as to whether the Bull Street

---

3. Pursuant to S.C.Code Ann. § 1-7-130 (1976), the Attorney General is charged with the protection of public charities and is required to enforce the due application of funds given or appropriated to such charities.

property is encumbered by a charitable trust and, if so, whether and under what conditions the property may be sold. We agree with the Attorney General's opinion that the property is subject to a charitable trust. However, given the change in circumstances in the care and treatment of mental health patients, we hold the doctrine of equitable deviation may be employed to allow a sale of the property with disbursement of the proceeds to be placed in trust for the benefit of DMH.

## ISSUES

1. Is the Bull Street property held subject to a charitable trust for the benefit of the Department of Mental Health?
2. If Bull Street is subject to a charitable trust, under what circumstances may the property be sold, and to whom are the proceeds disbursed?

## 1. CHARITABLE TRUST

This Court has recognized the benevolent purposes of the state hospital. *See Crouch v. Benet,* 198 S.C. 185, 17 S.E.2d 320, 323 (1941) holding that South Carolina was a pioneer of the southern states in the care of the insane which has been supported, maintained, and "pursuant to Acts of the Legislature and by means of appropriations for this most worthy, humane and beneficent purpose as a State Institution." Moreover, institutions for the insane are constitutionally provided for and subject to regulation by the General Assembly. Article 12, § 1, CONST 1895.

A charitable trust is defined as:
[A] fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with property for a charitable purpose. Restatement (2nd) Trusts § 348 (1959).... The settlor must manifest an intention to create a charitable trust. It is not necessary that any particular words or conduct be manifest to create a trust, and it is possible to create a trust without using the words "trust" or "trustee."

*Scott on Trusts* §§ 24–25 (2d Ed.1956); Restatement (2nd) *Trusts* § 24. Conversely, the mere fact these words are used,

or other similar words, does not necessarily indicate an intention to create a trust.

In the 1922 case of *Harter v. Johnson*, 122 S.C. 96, 115 S.E. 217 (1922), the Court was called upon to interpret the will of a deceased physician who had, by his will, bequeathed "[a]ll the residue of my estate, real and personal and mixed, ... I give and devise, for the purpose of establishing, building and equipping a public hospital in the town of Fairfax, for the treatment of white and colored patients." This Court, in addressing the issue of whether a charitable trust had been created, stated:

Trusts for public charitable purposes, being for objects of permanent interest and benefit to the public, and perhaps being perpetual in their duration, are upheld under circumstances under which private trusts would fail....

No formality in the use of language is necessary in order to create a public charitable trust. The courts look to the purpose for which the gift was made, rather than to the particular words used to designate that purpose. And while a gift cannot be sustained as a charity unless made upon a trust, either express or implied, that it shall be devoted to uses which the law recognizes as charitable, the omission from a bequest of the words in trust is not material, where the intention is clearly manifested that the whole property shall be applied by the legatee for the benefit of other persons than himself....

[it] is said: The founding and maintenance of hospitals and asylums of various kinds, and homes for destitute and friendless children, and the aged and infirm, constitute charitable uses or trusts, and bequests, devises, or other gifts for such purposes will be upheld in equity with a strong hand. Trusts for such purposes may be established and carried into effect, when, if not of a charitable nature, they could not be supported.

115 S.E. at 221–222. The Court has similarly found the existence of a charitable trust in cases in which it has not been expressly stated. *See Watson v. Wall*, 229 S.C. 500, 93 S.E.2d 918 (1956) (testamentary provision wherein testator directed that any surplus left after application of funds to specific purposes might be used to aid poor and indigent to obtain

182

medical care and hospitalization in judgment of testator's executor or executors was not so indefinite or general as to be ineffectual to create a charitable trust); *Porcher v. Cappelmann*, 187 S.C. 491, 198 S.E. 8, 9 (1938) (valid charitable trust created where testatrix bequeathed residuary estate to a named trustee, "to be used and expended in such manner as he may deem wise in assistance in the City of Columbia, S. C., to crippled children, in the provision of medical and surgical attention to such children, purchase of medicines, braces or other appliances or any other article to assist and benefit said children, said work for crippled children to be conducted in the City of Columbia, S. C.").

Further, as noted by the Attorney General, properties conveyed to a public charity are also impressed with a charitable trust. *See Wellesley College v. Attorney General*, 313 Mass. 722, 49 N.E.2d 220 (1943); *In Re Los Angeles County Pioneer Society*, 40 Cal.2d 852, 257 P.2d 1, 9 (Ca.1953) ("In cases where . . . property is conveyed without restriction to a charitable corporation . . . the charitable intent of the donor is ascertained by reference to the charitable purposes of the donee."); *In re Harrington's Estate*, 151 Neb. 81, 36 N.W.2d 577, 582 (1949) (a gift or bequest by name, without further restriction or limitation as to use, to a corporation conducted solely for charitable purposes, will be deemed to have been made for the objects and purposes for which the corporation was organized); *Brown v. St. Luke's Hosp. Assn.*, 85 Colo. 167, 274 P. 740 (1929) (St. Luke's Hospital came into being as, and continued to remain, a charitable institution such that all property held or acquired by it was impressed with a trust for the charitable uses and purposes).

We find the Arizona Supreme Court's opinion in *Goddard v. Coerver*, 100 Ariz. 135, 412 P.2d 259 (1966), directly on point. Like this case, Goddard involved land purchased for a state insane asylum. In September 1885, the Board of Supervisors of Maricopa County, Arizona, purchased 160 acres of land for $3500.00 On October 8, 1885, this same 160 acres was conveyed by the Board of Supervisors to the Board of Directors of the Insane Asylum of Arizona. The deed conveyed the property to the Directors "for the use and benefit of the Territory of Arizona And for said Asylum." 412 P.2d at 261. The deed went on to state, "for the use and benefit of the

Territory ..., and for said asylum in accordance with the provisions of the said acts of said Legislature." *Id.* at 262. (Emphasis supplied). However, the deed also purported to vest title in the directors, their assigns and successors, in fee simple absolute. *Id.* In 1965, the Asylum Board expressed an interest in selling 62 acres of the property to Maricopa County as a site for a new Maricopa County General Hospital. At the time, the property was being put to agricultural purposes in support of the asylum. The Arizona Supreme Court held the property had been conveyed to the Board of Directors in the form of a charitable trust.[4]

█ As in *Goddard,* the property here was conveyed for the charitable purposes of the State Hospital for the Insane. It was conveyed to the Board of Regents of the Hospital, and the General Assembly enacted enabling legislation specifically for the benevolent purpose of establishing a hospital for the insane. The General Assembly also deemed fit that title to the property vest in the Board of Regents, and has routinely authorized the appropriation of funds for its charitable purposes. We find that the deeds and the legislative acts giving rise to the State Hospital clearly evidence the creation of a charitable trust. Accordingly, we find the property is held in trust for the DMH.

## 2. SALE OF PROPERTY

█ Property subject to a charitable trust may not be terminated or altered by the General Assembly, but rather, must be approved by the court. *Smith v. Moore,* 225 F.Supp. 434 (E.D.Va.1963) (legislature cannot terminate a charitable trust, nor seek to control its disposition under doctrine of *cy pres;* however this does not mean that Legislature cannot properly reserve to the judicial branch the power to do so); see also *Second Ecclesiastical Society of Hartford v. Attorney General,* 133 Conn. 89, 48 A.2d 266 (1946) (supervision of charitable trusts is an inherent judicial function and is not a

---

4. In addition, the Court concluded that the unused portion of these lands could, consistent with the principles of equitable deviation, be approved by the court for reconveyance by the Hospital's board of directors to the county for construction of a general hospital. The equitable deviation issue will be addressed below.

matter for the legislature. As a court of equity, the court possesses the authority to carry out the intent of the donor of a charitable trust).

This Court has previously applied the doctrine of equitable deviation, which "permits deviation from a term of the trust if, owing to circumstances not known to the settlor and not anticipated by him, compliance would defeat or substantially impair the accomplishment of the purposes of the trust. Under these circumstances a court may direct or permit a trustee to accomplish acts that are unauthorized or even forbidden by the terms of the trust." *Epworth Children's Home v. Beasley,* 365 S.C. 157, 169, 616 S.E.2d 710, 716–717 (2005), citing *Colin McK. Grant Home v. Medlock,* 292 S.C. 466, 473, 349 S.E.2d 655, 659 (Ct.App.1986) (allowing trustees to deviate from original terms of charitable trust by selling six homes built in Charleston to serve needy, elderly, white Presbyterians and investing proceeds of sale with income distributed as housing subsidy to elderly, needy Presbyterians of all races).

■ Considerable flexibility will always be allowed in the details of the execution of a trust, so as to adapt it to the changed conditions. *Mars v. Gibert,* 93 S.C. 455, 466, 77 S.E. 131, 135 (1913) (refusing to allow trustees of John de la Howe School to deviate from original terms of charitable trust contained in 1797 will by devoting funds to college scholarships instead of early education, but explaining trustees could establish a school at a different location, which could work in conjunction with public school system to teach agricultural and mechanical arts); *All Saints Parish, Waccamaw v. Protestant Episcopal Church,* 358 S.C. 209, 227, 595 S.E.2d 253, 263 (Ct.App.2004).

■ It is undisputed that the Bull Street property is no longer necessary to house mentally ill patients. Accordingly, we find the doctrine of equitable deviation should be utilized to allow the property to be sold. However, we hold that the proceeds from any sale of the property must remain in trust for the benefit of DMH for the care and treatment of the mentally ill.

**DECLARATORY JUDGMENT ISSUED.**

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.